

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00013-CR

JOHN ANTHONY ADAMS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 16,092

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter
Partial Dissenting Opinion by Justice Moseley

# OPINION

Due to his uncooperative, unruly, and, at times, offensive behavior, John Anthony Adams was removed from the courtroom before the formal commencement of his trial. Adams was not returned to the courtroom until after he had been found guilty of two counts of indecency with a child by contact.[1] Adams' appointed counsel had been instructed that his role in the trial was that of "shadow counsel." Consequently, he did nothing during the course of Adams' trial. In effect, Adams was tried and convicted in absentia without the representation of counsel. The denial of counsel violated Adams' Sixth Amendment right to the assistance of counsel and is presumptively harmful. *See* U.S. CONST. amend. VI. We further find that the evidence was sufficient to establish Adams' identity as the accused named in the State's indictment and as the individual who committed the charged offenses. We reverse the conviction and remand this case to the trial court for a new trial.

## I. Courtroom Procedure

The events that led to Adams being tried in abstentia and without the assistance of counsel require some explanation. The charged offenses, two counts of indecency with a child by contact, allegedly occurred November 17, 2011. Adams was arrested and placed in jail two days later.[2] The indictment was filed February 3, 2012. On February 23, 2012, attorney Tim Cone filed several motions as counsel for Adams. On November 19, 2012, Cone filed a motion to withdraw as counsel. At a November 26, 2012, hearing on Cone's motion to withdraw, Cone

---

[1]*See* TEX. PENAL CODE ANN. § 21.11(a)(1) (West 2011).

[2]Adams was placed in custody in the county jail November 19, 2011, and remained there until he was sentenced January 15, 2013.

2

identified a lack of trust and communication between Adams and himself as the primary issues leading to his request. While acknowledging during the hearing that he had not been fully paid for his services, Cone affirmatively stated that compensation was not a primary factor behind his request to withdraw. On the issue of compensation, Adams, who was present at the November 26 hearing, believed that he and Cone had agreed that Cone would be paid when the case was resolved. On the issue of Cone's withdrawal, Adams said that he did not disagree with Cone's withdrawal, but he also stated that the withdrawal would adversely affect him because it would be difficult to find "representation as good if not better than [Cone]." Adams told the trial court he planned to retain counsel, and the trial court specifically instructed him that he needed to do that. However, seven days later, on December 3, the trial court appointed J. Scott Novy to represent Adams in this case. Novy promptly filed standard pretrial motions concerning the child-victim's testimony and recorded statements. Then, on January 3, 2013, Adams filed a pro se motion for a continuance alleging that counsel had withdrawn from his case and that he was seeking counsel outside of the area. Adams' pro se motion neither mentioned nor acknowledged the trial court's appointment of Novy as counsel.

The trial began January 14, 2013. Before voir dire, Adams refused to be sworn in as a witness and invited the court to hold him in contempt. Adams stated that he had contacted some law firms in Austin about representing him and that he had received an email from one firm, but he acknowledged that no attorney from any of the firms he had contacted would be in court to represent him that day. Adams complained that the trial court had not given him enough time to retain counsel. The trial court responded that she had appointed Novy to represent him. Adams

3

then indicated that he had told Novy he would be retaining his own counsel and that Novy "was good with that." Adams then turned his back to the bench, prompting the following exchange between the trial court and Adams:

> THE COURT: I will go ahead and admonish you, Mr. Adams, there are certain things, it is my understanding that -- well, first of all I appointed Mr. Novy to represent you. You have informed the court that you do not want Mr. Novy representing you; therefore, Mr. Novy -- Mr. Novy's status has changed from representing you as court-appointed counsel to being appointed as a shadow counsel. He will not interfere with your --

> [The Defendant]: He was never appointed as counsel.

> THE COURT: So you are listening. Thank you. He will not interfere with your representation of yourself which you will be doing since you have refused to allow Mr. Novy to represent you. Am I correct, you do not want Mr. Novy to represent you? Okay. Well, he's been appointed . . . He will be serving now, because of your refusal to accept him as your court-appointed attorney, unless you tell me otherwise right now he will be acting as shadow attorney . . . .

The record does not show that Adams waived his right to counsel or that he asked to represent himself. The trial court continued to admonish Adams, who kept arguing and interrupting. Adams then invited the trial court to hold him in contempt because the proceedings were, in Adams' opinion, "ludicrous."

A short time later, the venire was seated, and the trial court began explaining the jury selection process. By way of introduction, the trial court informed the venire members that the matter for trial was "Cause Number 16092, State versus John Anthony Adams." The trial court announced that "[Adams] has been appointed an attorney by the court as shadow counsel. He does not wish to have counsel." Adams interrupted, "That's not true . . . I told them that I was going to have my own counsel . . . ." Adams again invited the trial court to hold him in

4

contempt, stating, "[T]his is a charade." The trial court attempted to explain to the venire that Novy had been appointed "simply as shadow counsel" and that Novy was present in the courtroom "in case Mr. Adams decides he has questions or if he wants assistance." Adams again interrupted, announcing, "I want to hire my own attorney." A short time later, Adams interjected, "[L]et me hire my own attorney." As the trial court explained the voir-dire procedure to the venire panel, Adams continued to interrupt and argue. The trial court informed the venire that two different attorneys had represented Adams prior to the appointment of Novy and that the case had been pending a long time. Adams once again asked to be held in contempt of court and removed from the courtroom, saying, "This is a kangaroo [court]." At that point, the trial court had Adams removed from the courtroom. A jury was then selected by the State with Adams out of the courtroom and with no participation from shadow counsel. The next morning, the trial court announced to the jury panel that Adams "refuse[d] to come over" from the jail. The trial proceeded without Adams and with Novy sitting silently in his role as shadow counsel.

## II.   Denial of Counsel

Adams was not represented by counsel at trial. Prior to the start of trial, the trial court changed appointed counsel's status from that of counsel to that of shadow counsel, which placed him in the position of only assisting Adams in his self-representation. Adams was never in the courtroom during the trial, did not actually represent himself, and was never in a position to seek assistance from his shadow counsel. The defense did not conduct voir-dire examination, strike

the jury list,[3] make an opening statement, cross-examine the State's witnesses, present evidence, object to any evidence presented, preserve any issues for appellate review, participate in the charge conference, or present a final jury argument. In short, Adams was denied his right to counsel.

The State argues that the trial court did not err in denying Adams the opportunity to retain other counsel. While that may be true, it does not completely address the issue. The State correctly notes that a defendant does not have the right to obstruct the orderly administration of justice by postponing a trial. *See Burgess v. State*, 816 S.W.2d 424, 428 (Tex. Crim. App. 1991). We also agree with the State that Adams had ample opportunity prior to the beginning of his trial to hire counsel of his choosing, assuming he had the means and the intent to do so. However, the Court of Criminal Appeals has clearly articulated the three options available to a trial court when faced with an eleventh hour request to change counsel:

> First, at its discretion the court can appoint, or allow the accused to retain, new counsel. Second, should the trial court deny new counsel, and the accused unequivocally assert his right to self-representation under *Faretta*, persisting in that assertion after proper admonishment, the court *must* allow the accused to represent himself. Third, unless the trial court allows new counsel, it must compel an accused who will not waive counsel and does not assert his right to self-representation to proceed to trial with the lawyer he has, whether he wants to or not.

*Id.* at 428–29 (Tex. Crim. App. 1991) (citing *Thomas v. State*, 550 S.W.2d 64 (Tex. Crim. App. 1977); *Robles v State*, 577 S.W.2d 699 (Tex. Crim. App. 1979)). None of the three acceptable solutions was employed to manage the difficult situation that Adams created.

---

[3]A clerk noted on the defendant's strike list, "Defendant Did Not Participate."

An accused's right to the assistance of counsel is now a foundational element in our criminal justice system. In the words of the Court of Criminal Appeals,

> The Sixth Amendment guarantees that "[in] all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." The right to counsel at trial is regarded as fundamental. The assistance of counsel protects a defendant's right to a fair trial; counsel ensures that the prosecution's case is subjected to meaningful adversarial testing and safeguards the defendant's rights. An indigent defendant is therefore entitled to appointed counsel unless the defendant competently, intelligently, and voluntarily waives the right to counsel.

*Williams v. State*, 252 S.W.3d 353, 355–56 (Tex. Crim. App. 2008) (alteration in original) (citations omitted).

The trial court interpreted Adams' comments during the brief time he was in the courtroom as a waiver of his right to counsel and an assertion of his right to self-representation, but the record does not support that interpretation. To invoke the right to self-representation, an accused must clearly and unequivocally assert that right. *Scarbrough v. State*, 777 S.W.2d 83, 92 (Tex. Crim. App. 1989); *Funderburg v. State*, 717 S.W.2d 637, 642 (Tex. Crim. App. 1986). Adams' comments evince a strong desire to be represented by counsel. The trial court was not necessarily required to grant Adams additional time to retain counsel. However, upon refusing his request for additional time and in the absence of a clear and unequivocal waiver of the right to counsel and assertion of the right to self-representation, the trial court was required to compel Adams to proceed to trial with his court-appointed counsel. The failure to do this amounted to a denial of Adams' right to counsel.

"A complete denial of the constitutional right to counsel at trial is a structural defect that affects the framework of the trial." *Williams*, 252 S.W.3d at 357 (citing *Johnson v. United*

7

*States*, 520 U.S. 461, 468–69 (1997)). Even if Adams clearly invoked his right to self-representation, the trial court was required to admonish him in accordance with *Faretta v. California*, 422 U.S. 806, 818 (1975) (trial court must inform defendant of dangers and disadvantages of self-representation to establish on record that defendant is aware of perils). In such a situation, it is incumbent upon the trial court to admonish the defendant that he will receive no special consideration due to his self-representation and that he will be required to follow the very technical rules of procedure and evidence just as he would if had the assistance of counsel. *Williams*, 252 S.W.3d at 356.

A complete denial of the right to counsel is a structural constitutional error, and, as such, is immune from harmless-error analysis. Accordingly, we find that the trial court erred in proceeding to trial without Adams being represented by counsel. We reverse Adams' conviction and remand to the trial court for a new trial. Since this error requires that we reverse and remand for a new trial, it is not necessary to address Adams' point of error complaining that he was improperly excluded from the courtroom. Because Adams factual sufficiency issue, if sustained, would entitle him to greater relief than that afforded pursuant to our representation holding, we address it below. *Rains v. State*, 604 S.W.2d 118, 120 (Tex. Crim. App. 1980); *see* TEX. R. APP. P. 47.1; *Grotti v. State*, 209 S.W.3d 747, 773 (Tex. App.—Fort Worth 2006), *aff'd*, 273 S.W.3d 273 (Tex. Crim. App. 2008); *Sterling v. State*, 200 S.W.3d 842, 844 (Tex. App.—Corpus Christi 2006, no pet.).

8

### III. Sufficiency of Identification Evidence

Adams claims that the evidence was insufficient to prove either (1) that he was the person named in the State's indictment or (2) that he committed the charged offenses. Adams was never in the courtroom after the jury was impaneled and sworn, and none of the testifying witnesses directly identified Adams in the jury's presence. The issue, then, is whether a rational jury could have found, beyond a reasonable doubt, that Adams was the defendant named in the indictment and that he was the person who committed these offenses.

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found beyond a reasonable doubt the essential elements of indecency with a child by contact. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). In conducting a legal sufficiency review, we must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible. *Shaw v. State*, 122 S.W.3d 358, 364 (Tex. App.—Texarkana 2003, no pet.) (citing *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). We evaluate the

evidence in light of a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

The precise issue in this case is whether we can conclude from a totality of the circumstances that the jury was adequately apprised that the witnesses' references to "Mr. Adams," "John Adams," or "Uncle John" were in fact references to the appellant, John Anthony Adams. *See Rohlfing v. State*, 612 S.W.2d 598, 601 (Tex. 1981).

### A.    Courtroom Occurrences

Before the jury was selected, an individual was brought before the trial court. The trial court, at all times, referred to this individual as "Mr. Adams." Almost immediately, Adams began arguing with the trial court and suggesting that the court hold him in contempt. As the trial court attempted to admonish "Mr. Adams," he turned his back to the bench. The trial court attempted to continue the proceedings but was hindered by continuing interruptions and outbursts from Adams. After a brief period of this unruly behavior, the trial court stated, "Mr. Adams should be brought back to court for jury selection at 10:25."

As the venire from which a jury was selected was seated, Adams was returned to the courtroom. While there, in the presence of the venire, the trial judge identified Adams by name on four occasions as she attempted to explain to the panel (over his repeated interruptions and complaints) how his self-representation would take place. In the process, the judge warned him that if he did not behave appropriately, he could be sent back to the jail and held in contempt for his behavior. Continuing, the judge attempted to explain the jury selection process to the venire

10

despite Adams' repeated interruptions with argumentative and, at times, insulting comments. Eventually, the trial court had Adams escorted from the courtroom.

### B.    Evidence At Trial

The next day, the trial court called case "Number 16,092[,] State versus John Anthony Adams." Even though Adams was incarcerated at the county jail, the jailers reported that Adams refused to come to the courtroom. The trial commenced, and testimony was presented. The child's mother, T.H.,[4] testified that she was previously married to Daniel Birch, who was related to John Anthony Adams. According to T.H., "[H]e was my husband's aunt's husband." John Adams was married to Rebecca Adams, and they lived in Union Grove, Upshur County, Texas. Rebecca worked with T.H. at the Kilgore newspaper. T.H. at some point disclosed to Rebecca that she was having difficulty affording day care for her children. Rebecca volunteered her husband to watch T.H.'s children while she was working at the newspaper. T.H. accepted Rebecca's offer, and shortly thereafter, T.H. began leaving her children in Adams' care while she worked. T.H. frequently allowed the children to remain in Adams' care all night since she worked until 11:00 or 12:00 at night. T.H. also allowed the children to stay with Adams at other times. According to the evidence, the children generally stayed with John during the day. One day, as T.H. was taking her children home, one of the children reported, "Uncle John touched my pee pee." The child clearly identified "Uncle John" as the only person who touched her. On direct examination, the State asked T.H. if she advised her child to make up these allegations against "John Anthony Adams," which she denied. T.H. was also asked by the State on direct

---

[4]We will use the mother's initials rather than her name.

examination, "Since that day and that outcry in the car have you seen the defendant John Anthony Adams or had any form of conversations with him." She replied that she had not.

Chris Clark, an investigator with the Upshur County Sheriff's Office, was assigned to investigate the allegations of indecency with a child lodged against John Anthony Adams. Through the use of a television monitor, Clark was able to observe the interview of the child-victim conducted by an employee of the Children's Advocacy Center. Clark also interviewed T.H. Clark then located John Anthony Adams and advised him of the allegations against him. Clark attempted to interview Adams, but as soon as the child's name was mentioned, Adams had nothing else to say. At that point, Clark terminated his interview with Adams. Clark testified at trial that the child consistently identified the perpetrator as "John Adams." He also testified that the child "was consistent with where the abuse took place." John Anthony Adams was arrested and taken to jail. The child described a "hairy room" with lots of dog hair "where John Adams had a dog in his room." According to police reports entered into evidence at trial, officers found the "house consistent with what [the child] described in the [CAC] interview." Clark submitted the findings of his investigation to the Upshur County District Attorney on November 17, 2011.

C.     Analysis

The lack of a formal, in-court identification does not necessarily render the evidence insufficient to establish identity. *See Purkey v. State*, 656 S.W.2d 519, 520 (Tex. App.—Beaumont 1983, pet. ref'd). Identity may be shown by circumstantial evidence and the reasonable inferences therefrom. *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd). In the absence of an in-court identification of the perpetrator, there is no

12

formula for proving the identity of the accused. *Clark v. State*, 47 S.W.3d 211, 214–15 (Tex. App.—Beaumont 2001, no pet.).

In *Purkey*, the defendant was on trial for rape, and there was no in-court identification of the defendant as the perpetrator of the rape. Purkey was introduced to the jury panel when voir dire began as Mr. James Otis Purkey. *Purkey*, 656 S.W.2d at 520. However, while questions were propounded referring to "defendant James Otis Purkey, Jr." and to "defendant Jimmy Purkey," the only references by the trial witnesses were to "Mr. Purkey," "Jimmy Purkey," or "Jimmy." *Id.* The victim testified at trial that she had known the defendant for many years and that he raped her. In finding the evidence sufficient to establish identity, the Beaumont court found that there could have been no doubt in the juror's minds that the witnesses were referring to the defendant when they used the names "Mr. Purkey," "Jimmy Purkey," and "Jimmy." From the totality of the circumstances, the jury was adequately apprised that the witnesses were referring to the defendant, James Otis Purkey, Jr. *Id.* at 520. (citing *Rohlfing*, 612 S.W.2d at 601); *see also Meeks v. State*, 897 S.W.2d 950, 955 (Tex. App.—Fort Worth 1995, no pet.) (complainant testified that babysitter named "Johnny" sexually assaulted her; complainant's mother testified Johnny Meeks and his wife were in charge of babysitting complainant; "Johnny" was identified as "Johnny Meeks"; failure of complainant to identify defendant in court pertained only to weight and credibility of witnesses); *Smallwood v. State*, No. 02-02-00438-CR, 2003 Tex. App. LEXIS 7167, at *7–9 (Tex. App.—Fort Worth Aug. 21, 2003, no pet.) (mem. op., not designated for publication) (no in-court testimony specifically identified appellant as same Tanya Smallwood who repeatedly made harassing telephone calls and whose telephone records were

13

introduced into evidence; witnesses referred to appellant by name and as "defendant" throughout testimony; no other "defendant" on trial); *Johnson v. State*, No. 14-98-01079-CR, 2000 Tex. App. LEXIS 1607, at *9–10 (Tex. App.—Houston [14th Dist.] Mar. 9, 2000, no pet.) (not designated for publication) (arresting officer referred to "defendant" as person he arrested, took into custody, and found in possession of stolen jewelry; as appellant was only "defendant" on trial and there was no indication witness was referring to someone other than appellant, evidence sufficient to establish identity).

In this case, in the presence of the venire, the trial court addressed the accused as "Mr. Adams." There were other instances where the court referred to Adams and he never disagreed with the trial court; these instances constituted circumstantial evidence that Adams was the defendant in this case. The State argues, "Circumstantially, the jurors could gather from the start of voir dire and the testimony from the witness stand discussing John Adams, that the man who responded to Mr. Adams without *any* contention as to his identity, was the same defendant listed in the indictment and jury charge." The State reasons that because Adams argued vehemently with the trial court about his attorney and offered no protestations when addressed as "Mr. Adams," such is a tacit admission that he was the defendant named in the indictment.

"[V]oir dire examination and opening and closing statements are not evidence." *Fuller v. State*, 73 S.W.3d 250, 264 (Tex. Crim. App. 2002). Nothing in the record suggests Adams was under oath when he was arguing with and answering the trial court in front of the venire; nor did the trial court ever directly ask Adams if he was the John Anthony Adams in the indictment, if he

14

understood the charges against him, or arraign him. The trial court did, however, inform the panel that the case to be tried was the State of Texas versus John Anthony Adams.

Statements made during voir-dire examination have been considered in analyzing the sufficiency of identifying evidence. In *Purkey*, the reviewing court took into consideration that Purkey was introduced to the panel at the beginning of voir dire as Mr. James Otis Purkey. The Beaumont court found that in the context of the trial as a whole, there could have been no doubt in the minds of the jurors that the witnesses referred to Purkey, the defendant, in their testimony. The totality of the circumstances established that "the jury was adequately apprised that the witnesses were referring to appellant." *Purkey*, 656 S.W.2d at 520 (quoting *Rohlfing*, 612 S.W.2d at 601). In *Wiggins v. State*, 255 S.W.3d 766 (Tex. App.—Texarkana 2008, no pet.), we considered occasions in voir dire when the State and defense counsel referred to Wiggins as the defendant; however, there was also a video recording of Wiggins at the scene of the DWI stop which of itself we found sufficient evidence of identification. *Id.* at 771.

We believe that the jury ultimately selected, having been in the courtroom while Adams was protesting to the trial judge, could conclude that the man standing before the judge was indicted for this particular offense and was the defendant in this case. The remaining question is whether there is evidence that the John Anthony Adams who was the defendant in this cause and who appeared, albeit briefly, in court is the same person that the victim referred to as her assailant. We conclude that there is sufficient evidence to connect the two.

The victim's mother knew a man named John Anthony Adams and his wife Rebecca. T.H. worked with Rebecca Adams and was distantly related to John Anthony Adams. At some

15

point, Rebecca volunteered her husband, John, to babysit for T.H.  So, the John Anthony Adams who lived in Union Grove in Upshur County, Texas, began watching the child-victim.  One day as T.H. was driving the child from Adams' home, the child said to her mother, "Uncle John touched my pee-pee."  The next day, T.H. reported this to the Upshur County Sheriff's Office.  Officer Chris Clark talked with T.H., and based on her report and the child's interview, Clark contacted and ultimately arrested John Anthony Adams.  Adams was indicted for this offense and placed in jail where he remained until trial.  Throughout the trial, witnesses referred to John Anthony Adams as the offender in this case.  Finally, T.H. connected the offense to the defendant when she acknowledged that she had not been in contact with "the defendant John Anthony Adams" since the day of the outcry.  There was only one defendant in the case.

In addition, the one law enforcement witness, Investigator Chris Clark testified about the investigation.  He was asked about a statement made by the child-victim in her video-recorded interview in which she described the alleged inappropriate touching.  The child said something about "Uncle John's hairy room" where Adams' dog shed hair.  Clark testified that the officers who searched Adams' home found a room consistent with this description.

It is the responsibility of the jury to weigh the evidence, resolve any conflicts in testimony, and "draw reasonable inferences from basic facts to ultimate facts."  *Hooper*, 214 S.W.3d at 13 (quoting *Jackson*, 443 U.S. at 318–19).  Texas courts are directed to apply the standard enunciated in *Jackson* to "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most

16

favorable to the verdict." *Id.* at 16–17 (citing *Jackson*, 443 U.S. at 318–19). An inference is "a conclusion reached by considering other facts and deducing a logical consequence." *Id.* at 16.

Based on the totality of the circumstances, it was reasonable for a jury to conclude that the person in the courtroom referred to as "Mr. Adams" by the trial court and who had been arguing with the trial judge in the courtroom was the same person—John Anthony Adams—that the victim reported to her mother touched her private parts. Viewed in the light most favorable to the verdict, "the necessary inferences are reasonable based on the combined and cumulative force of all the evidence." *Id.* at 16–17. The evidence is sufficient to support the jury's finding that the appellant, John Anthony Adams, was the individual charged in the indictment.

We reverse the judgment of the trial court and remand the cause for further proceedings.


Jack Carter
Justice


PARTIAL DISSENTING OPINION

Although I completely concur with the majority that reversible error occurred because there is no evidence that John Anthony Adams elected to represent himself in his trial, I reluctantly disagree that the State took the requisite steps to provide the evidence of Adams' identity, a necessary element of its case.

The majority opinion correctly describes the standard for the measure of legal sufficiency and restating it would be redundant.

In taking the position that Adams has been sufficiently identified at trial, the majority relies heavily on the events that occurred before and during voir dire of the jury panel.

Assuredly, Adams was present in the courtroom before commencement of voir dire and both the trial court and the prosecutor made reference to him before the jury panel as "Mr. Adams." By his contumaciously contemptible behavior, Adams must have drawn a great deal of attention to himself at that time. Due to his outbursts, Adams was removed from the courtroom and then returned for a short while in the presence of the panel before he caused himself to be ejected from the courtroom once again. Even though he practiced conduct which would have had the impact of indelibly stamping himself on the minds of almost anyone who would have been in attendance, this unforgivable conduct occurred before the jury was actually empaneled and before any evidence could have been provided to the jury. Pointing out that the jury was drawn from the panel who witnessed all of these things, the State says that "[c]ircumstantially, the jurors could gather from the start of voir dire and the testimony from the witness stand discussing John Adams, that the man who responded to Mr. Adams without *any* contention as to his identity, was the same defendant listed in the indictment and jury charge." Contrarily, we must take into account that "voir dire examination and opening and closing statements are not evidence." *Fuller v. State*, 73 S.W.3d 250, 264 (Tex. Crim. App. 2002).

The majority opinion relies chiefly on the fact that the trial judge made reference at that time to the accused as "Mr. Adams" and announced that the case was styled, The State versus John Anthony Adams, together with the fact that the State's attorney treated him as the person on trial. Should we ignore the fact that these statements were made before commencement of the

18

trial, we are still faced with the fact that such statements by the trial court and the State would need to be included in the evidence upon which the jury relied. Surely though, no one should be able to attribute statements made by the trial judge or the State's attorney as evidence of the identity of the defendant (whether during voir dire or after commencement of the trial) because that would put the trial court and the State's attorney in the posture of (unsworn) fact witnesses.

After the trial actually commenced, the State presented three fact witnesses: (1) Tara Hamblen, the mother of the victim; (2) Martha Dykes, who interviewed the child victim; and (3) Chris Clark, an investigator with the Office of the Upshur County Sheriff.

Hamblen (the niece of Adams' wife) testified that Adams tended the child while Hamblen worked. She related that the child had told her that Adams (to whom the child made reference as "Uncle John") had touched her inappropriately. Adams was not in the courtroom during this testimony and Hamblen did not identify him to the jury. No attempt was made to tie "Uncle John" to the man who had previously been in the courtroom.

Dykes, a trained child forensic interviewer, testified about having talked with the child and a video recording of that interview was admitted into evidence. Even so, no attempt was made to have Dykes identify Adams as the perpetrator to whom the child made reference.

Clark testified that he had contacted Adams about the allegations made against him regarding the child but that Adams refused to cooperate with him. Clark provided no testimony that would aid to identify Adams, the person on trial, as being the accused.

This case can be contrasted with this Court's case of *Smith v. State*, 51 S.W.3d 806 (Tex. App.— Texarkana 2001, no pet.). In *Smith*. the defendant became upset with his counsel at the

19

beginning of voir dire. He became disruptive, asked to leave the courtroom, refused to follow the trial court's instructions, and was finally removed from the courtroom. *Id*. at 810. Being returned to the courtroom a short time later, Smith "strenuously requested" a new appointed counsel, became very disruptive, and refused to assure the trial court he would behave appropriately if allowed to remain in the courtroom, whereupon he was once again removed. *Id.* The similarities to the *Smith* case now cease. In *Smith*, a witness who had witnessed some of the events leading to the charges against Smith, went to the cell where Smith was then being held during a trial break, and identified Smith as the perpetrator. The witness also identified a photograph of Smith. We have none of that here.

As mentioned before, my position on this matter is taken very reluctantly because I realize that this failure to identify Adams can only be counted as a failure of the State to prove a necessary element of its case with the ineluctable conclusion that there was a legal insufficiency of the evidence to sustain the conviction. The reluctance on my part springs from the fact that it appears that the general chaos that brought about the errors in this case were precipitated by the inexcusable conduct of Adams himself. Therefore, it would seem that the position I take would reward Adams for his own bad behavior by directing an acquittal.

Even so, I would hold that the State failed to prove its case and order Adams' acquittal.

Bailey C. Moseley
Justice

Date Submitted:    September 18, 2013
Date Decided:    December 13, 2013

Publish