

# NUMBER 13-24-00190-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

HENRY SILVA, Appellant,

v.

THE STATE OF TEXAS, Appellee.

## ON APPEAL FROM THE 372ND DISTRICT COURT
## OF TARRANT COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Silva, Peña, and Fonseca**
**Memorandum Opinion by Justice Fonseca**

Appellant Henry Silva was convicted of two counts of indecency with a child by contact, a second-degree felony, and he was sentenced to concurrent four-year prison terms. *See* TEX. PENAL CODE ANN. § 21.11(a)(1). On appeal, Silva argues the convictions should be reversed because the prosecutor made an improper closing argument following

the guilt-innocence phase of trial. We affirm.[1]

# I. BACKGROUND

In 2019, a Tarrant County grand jury returned an indictment alleging that Silva intentionally engaged in sexual contact with Carla,[2] a child younger than seventeen, by touching her genitals and breasts with the intent to arouse or gratify the sexual desire of any person. *See id.* § 21.11(a)(1), (c)(1). Both offenses were alleged to have occurred on or about May 26, 2012. Trial took place in February of 2024.

## A. Voir Dire

At voir dire, the prosecutor asked if any venire members "had experience with child sexual abuse," and several members of the panel raised their hands. One venire member elaborated that she is "in HR" and knew "an employee" who experienced sexual abuse by a family member when she was a child. The prosecutor asked whether the victim "t[old] immediately when it happened to her," and the venire member replied: "I believe she told her mother. Her and her mother have a really bad relationship. She's in her 30s now. This happened when she was eight or nine." Another venire member explained: "I have on both sides where a parent coached the child to say they were assaulted and they [weren't], and I also had experience with a relative that the father, when he was on drugs, did that." A third venire member stated: "So my sister-in-law, when she was a child, she's now in her mid[-]60s, I probably found out when she was 40 that that had happened to

---

[1] This appeal was transferred from the Second Court of Appeals in Fort Worth pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001. We are required to follow the precedent of the transferor court to the extent it differs from our own. TEX. R. APP. P. 41.3.

[2] To protect the complainant's identity, we refer to her and her relatives by pseudonyms. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX. CODE CRIM. PROC. ANN. ch. 58, subch. C ("Confidentiality of Identifying Information of Sex Offense Victims").

her. A dear friend of our family that's best friends with my daughter, her father, he ended up in jail." The venire member explained that her sister-in-law "eventually" told her brother about the abuse, but she did not tell anyone else because "she was embarrassed" and "felt that people wouldn't believe her."

A fourth venire member, a Tarrant County employee, stated that she was sexually abused by her mother's boyfriend when she was in fifth grade. She explained that she did not tell anyone about the abuse at the time because she was embarrassed and afraid of "[g]etting someone in trouble." The venire member stated that the experience "made [her] an advocate for children" and that she has been "working with kids for about 20 years in mental health and substance abuse."

During his examination, defense counsel also asked whether any members of the panel had experience with sexual abuse. One venire member stated: "I have a daughter that accused a family member and it wasn't true and then because of that, a lot of family members came out and discussed things that happened in their past." Another member stated: "I was a victim and then I'm a teacher, so students." Yet another member stated: "My mother was raped by one of my grandmother's brothers and my sister was raped as a child from one of my mother's now ex-husbands."

Ultimately, all of the venire members affirmed that they could be fair and impartial in the case, and a jury was selected and empaneled. During opening argument, the prosecutor told the jurors: "[W]hat you heard this morning in voir dire, the themes, the things you heard about why kids don't tell, are the exact same themes and the exact same things that we expect you to hear over the course of the next two or three days."

3

**B.    Trial Testimony**

At trial, Carla's mother Brenda testified that she has seven children ranging in age from fifteen to twenty-four years old. Carla was nine years old at the time of the alleged offenses and was twenty at the time of trial. Brenda stated that she often took the children to her cousin Mary's three-bedroom apartment in Arlington. Silva is one of Mary's children and would sometimes be at the apartment. Brenda believed Silva was "about 17" at the time of the alleged offenses, but she did not know his exact birthdate.

Brenda stated that Carla had been a happy child but started showing signs of depression when she was in fifth grade. According to Brenda, Carla "didn't like taking instruction from [Brenda's] husband" and would "become very angry" when any male approached her. Her grades at school also suffered. When she was twelve or thirteen, Carla "would have outbreaks of anger and if another student would tell her something, approach her as in screaming at her, things like that would cause her to get into a fight." When Carla was in middle school, Brenda discovered text messages on Carla's phone in which she told "boys" that "she liked older men" and that "she wanted them to touch her"; Brenda also saw "sexy" and "provocative" photos of Carla on the phone. Brenda approached Carla about the messages and photos but Carla "would just cry . . . and not want to talk."

Brenda testified that, when Carla was in ninth grade, her behavior became worse and she started "making marks on herself, like hickeys." In October of 2017, police came to Brenda's home and informed her that Carla "rewrote in the bathroom stall of the high school that there was a shooting that was going to take place," which eventually led to her expulsion and placement in an alternative school. The same day the police came,

4

Brenda confronted Carla, and Carla reported to her that Silva had "touched her in her private area" when she was about nine years old. Carla reported that the touching occurred in one of the bedrooms at Mary's apartment, while Brenda and Mary were in the kitchen cooking. Carla told Brenda that she was playing video games with her brothers and cousins, but "they went out of the room" and she was left alone with Silva.

Like her mother, Carla testified that she and her family frequently visited Mary's apartment, and that Silva was often there as well. She said that, on the day in question, Mary and her mother were cooking dinner together, which was unusual, while the children were playing video games in one of the bedrooms. She testified that two of the children locked themselves in her cousin Peter's bedroom and would not let her in, which upset her. She continued:

> And I kept knocking on the door, crying, because I wanted to play the game but they didn't allow me to go in. So I went to the living room and I was crying to my mom and telling her they weren't allowing me to play the game. That's when [Silva] stood up and he told me he'd take me to go play a game and he took me into this room and he closed the door. We sat on his bed. He was asking me what game I wanted to play and he was telling me to sit between his lap, on his lap. . . . He turned the TV on and he told me to choose the character I wanted to be on Mario [K]art. I got up and I went to go point it out at the TV and I was standing there and he told me to come back to sit on his lap, and I didn't want to. I was scared, but I didn't know what to do, so I went back and sat on his lap. That's when he got his hand and started rubbing me. . . . We were there for a while. I don't recall how long. And then after that—well, he had his left hand rubbing me, as well, up and down on my body. After that he got up and left and I just stayed in the room.

Carla clarified that Silva touched her on her vagina and on her chest area, over her clothes.

Carla stated that the last time she saw Silva was when she went to Mary's apartment to babysit Mary's boyfriend's daughter Amy. She testified:

When I seen [sic] the way [Amy] was all over [Silva], the way they allowed

5

her to be around [Silva], it scared me because I didn't want the same thing happening to her. . . . That's what made me have the courage to come out to my mom and tell her.

She acknowledged, however, that it was not until "years later" that she told her mother about Silva's abuse. When asked why she did not tell for so long, she said: "I was scared. I didn't know how to tell somebody." Carla further conceded that she sometimes sent "sexual texts" and "body pictures" to boys and older men during her "teenage years."[3]

Brenda reported Carla's 2017 outcry to the Arlington Police Department (APD). Tabitha Brown, an APD officer, testified that she responded to the call along with a rookie officer whom she was training. Brown stated that she and the trainee interviewed Brenda and Carla separately, and as a result of the interviews, they identified Silva as a suspect.[4] Several days later, APD detective Dara Dewall was assigned to the case. When asked whether it was "common" for an officer to "interview the mother and the 14-year-old of a sexual abuse report," Dewall replied: "The mother, yes, because she was the outcry witness, but it is not okay to interview the child" because "[c]hildren are easily le[]d if they are interviewed." Instead, Dewall stated that initial forensic interviews of alleged child abuse victims should be done at the Alliance for Children, a children's advocacy center.

Dewall admitted that she did not request an arrest warrant for Silva until 2019, even though her investigation concluded in early 2018, and she did not seek to interview Silva prior to his arrest. She said "[t]here's no excuse . . . for it to take almost two years to complete an investigation." She agreed with the prosecutor that she "should have done

---

[3] On cross-examination, Carla acknowledged that she met with a Child Protective Services caseworker on October 4, 2012, and the caseworker asked if she had ever been sexually abused. When defense counsel asked whether Carla recalled telling the caseworker that she had "never been sexually abused before," Carla replied: "I don't."

[4] Brown stated that she learned during her investigation that Silva was born on November 7, 1991, so he would have been twenty years old at the time of the alleged offenses.

better" in this case, and she agreed with defense counsel that "a person accused of a crime deserve[s] a better investigation than what's been done here."

Carla was interviewed at the Alliance for Children on November 3, 2017. The forensic interviewer, Charity Jackson, testified that Carla told her she was "[s]ix or seven years old" when the abuse occurred. Carla was able to recall "peripheral details" about the incident, such as what she was doing and wearing at the time. Jackson said she would not "expect a child who's been coached to be able to provide" such details. Lindsey Dula, a consultant and former forensic interviewer, testified that she reviewed Jackson's interview and had no concerns about Carla having been coached. Carla was later taken to Cook Children's Hospital for a sexual assault nurse examination on December 18, 2017. At the examination, Carla provided a patient history consistent with her trial testimony. However, no physical evidence of abuse was observed or recovered.

Silva testified in his own defense and denied all the allegations against him. He said: "I do not know why [Carla is] lying." Mary testified that Silva never lived with her at the Arlington apartment and never had his own bedroom there. She also said that the only video games in the apartment were in the living room and in her son Peter's room.

## C.    Closing Argument and Verdict

After the presentation of evidence, the prosecutor made an initial closing argument and defense counsel responded, arguing in part:

> The first time she talked to law enforcement, she said she was nine years old. When she went to Alliance for Children, she said she was six or seven. When she went a month later to the hospital, she said she was nine years old. We know she was in trouble. We know about this stuff going on in her life and this only came out after being asked for years about it. The motive is to get out of trouble.
>
> . . . .

Mom starts asking her, Well, did somebody do something to you, who sexually abused you. Nobody. Two years, it's nobody. She's sexting. She's sending these pictures. Nobody. Nobody has done anything to her. Then we get the school shooting threat. I don't know everyone's personal experiences here as far as what's the most severe things that you've ever dealt with as far as crimes or loved ones or things like that, but I would expect that for all, if not most of you, that's more trouble than you can imagine being in. And at 14 years old, imagine being in that trouble. And Mom asked her those same questions again and this time there was a way out of that. There was a way to not be in trouble and it was [to] blame somebody in a situation we know couldn't have happened.

The prosecutor then began her rebuttal closing argument as follows:

[Prosecutor]: Do you see now? That is exactly why kids don't tell. That is exactly why when you were in voir dire you saw all those hands shoot up and say, I've had experience with sexual abuse before.

[Defense counsel]: Object to improper argument as to voir dire.

THE COURT: Overruled.

[Prosecutor]: They didn't tell. You remember those jurors talking about being in their 30s and 40s—

[Defense counsel]: Object as to improper argument as to voir dire not being evidence. Request a running objection, Judge.

THE COURT: That is overruled, and the running objection, that is granted, but your objection is overruled.

You may continue.

[Prosecutor]: They didn't tell. Guilt. Shame. Nobody will believe me, I don't want to go through the process, you heard that over and over. This is exactly why. Because you are cross-examined. You are belittled. You're attacked. If you don't remember exactly the day it happened, if you didn't write that down in your journal, if you didn't mark that in a calendar, then that's a reason to be cross-examined and belittled and not believed. If you didn't get everything perfect, then we don't believe you. That's why so many people don't tell. That's why she didn't tell for all those years. Think about the process of what she's gone through over the last, gosh, 12 years or so, when she is nine years old and this happens to her, all the days and times that she thought

8

about telling her mom. Think about when all of us want to tell something difficult to somebody. We think about it. We agonize about it. We avoid it. What will they think, I don't want to hurt anybody. Think about all the moments that she sat there and wanted to tell but she was afraid and then finally when she sees that [Silva] now is around another child, when she goes over there and they're babysitting Amy, she thinks to herself, Oh, good Lord, I can't let this happen to another child.

The jury convicted Silva as charged and assessed punishment as set forth above. This appeal followed.

## II.    IMPROPER ARGUMENT

By a single issue on appeal, Silva contends that the trial court erred by "allowing the State," in the excerpt of the closing argument set forth above, "to make an outside-the-record reference to venire members' stories of sexual abuse." He further contends that the error affected his substantial rights and therefore requires reversal.

## A.    Applicable Law and Standard of Review

Permissible jury argument falls into four general categories: "(1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement." *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Improper closing arguments include references to facts not in evidence or incorrect statements of law. *Coleman v. State*, 577 S.W.3d 623, 639 (Tex. App.—Fort Worth 2019, no pet.)

We examine alleged improper argument in light of the facts adduced at trial and in the context of the entire argument, *Stahmann v. State*, 548 S.W.3d 46, 68 (Tex. App.—Corpus Christi–Edinburg 2018), *aff'd*, 602 S.W.3d 573 (Tex. Crim. App. 2020), and we review the trial court's ruling on an objection for abuse of discretion. *Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004). A trial court abuses its discretion when it acts

9

arbitrarily, unreasonably, or without reference to guiding rules and principles. *State v. Lerma*, 639 S.W.3d 63, 68 (Tex. Crim. App. 2021).

**B.     Error**

Silva contends that the prosecutor's argument did not fall into any of the four general permissible categories. *See Brown*, 270 S.W.3d at 570. First, he argues that the comments could not have been a summation of or deduction from the evidence because "[s]tatements made during voir dire examination are not evidence." *Deere v. State*, 631 S.W.3d 762, 776 (Tex. App.—Eastland 2021, pet. ref'd); *Adams v. State*, 418 S.W.3d 803, 811 (Tex. App.—Texarkana 2013, pet ref'd); *see Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 753 (Tex. 2006); *Hawkins v. State*, 99 S.W.3d 890, 898 (Tex. App.— Corpus Christi–Edinburg 2003), *rev'd on other grounds*, 135 S.W.3d 72 (Tex. Crim. App. 2004); *see also Montez v. State*, No. 02-16-00175-CR, 2017 WL 2807395, at *6 (Tex. App.—Fort Worth June 29, 2017, no pet.) (mem. op., not designated for publication). He further contends that the prosecutor's argument could not have been an "answer" to the argument of opposing counsel because "[o]nly after the State initially framed and highlighted the topic of Carla's delayed outcry did Silva subsequently argue in closing regarding that delay." *See Longoria v. State*, 154 S.W.3d 747, 766 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) ("Under the invited argument rule, a prosecutor is entitled to respond to defensive argument that goes outside the record, so long as the prosecutor's argument does not stray beyond the scope of the invitation.").

The State concedes that statements made during voir dire are not evidence; however, it maintains that the prosecutor's remarks were otherwise supported by witness testimony admitted without objection at trial. For example, Jackson testified that delayed

outcries of abuse "are very common because the child had those confusing feelings about that person that they love and care for" and "they may actually feel some type of guilt, like it was their fault." Jackson further stated that it is uncommon for children to tell about their abuse the first time they are asked about it "[b]ecause it's embarrassing and they are hesitant to talk about it." Dula testified that it is "more common than not" that a child's outcry of abuse is delayed, and she has seen delays of "even longer" than seven years. She explained:

> [M]ost often children are sexually abused by somebody that they know and trust, so that adds on to being a barrier for a child disclosing. It's embarrassing to talk about body parts. Most normal healthy families don't talk often about healthy sexual interaction and so now when you're talking about unhealthy sexual interaction where you're talking about sexual abuse that's done by somebody who's supposed to be trusted, somebody who's loved by their family members, that's another barrier to have to go and say this is somebody who we all love but is doing bad things to me. So that relationship can be a very significant barrier to children disclosing.

The State further argues that the prosecutor's argument was permissible because "the concept that a child may delay disclosing sexual abuse until adulthood due to feelings of guilt, shame[,] or fear of disbelief are matters within [the jurors'] common knowledge." *See Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014) (noting that "the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence"); *Torres v. State*, 754 S.W.2d 397, 401 (Tex. App.—Corpus Christi–Edinburg 1988, pet. ref'd) (finding defense counsel was not ineffective for failing to object to prosecutor's outside-the-record statement that "[a] lot of people are dying" from cocaine use because it "may easily be classified as common knowledge").

We agree with the State that there is no abuse of discretion apparent from the record. Although the prosecutor mentioned the discussion in voir dire regarding the venire

11

members' prior experiences with sexual abuse, she did not reference any particular facts recounted by the members.[5] In any event, as the State notes, the general concept espoused by the State in its remark—i.e., that children may delay reporting abuse because of "[g]uilt," "[s]hame," and fear of being "belittled" and "attacked"—was amply supported by the testimony of Jackson and Dula and could reasonably be described as "common knowledge." Accordingly, the trial court was within its discretion to determine that the remarks constituted a summation of or reasonable deduction from the evidence adduced at trial. *See Brown*, 270 S.W.3d at 570. Moreover, in his closing, defense counsel relied on the seven-year delay in Carla's outcry to argue against her credibility; accordingly, the trial court was within its discretion to determine that the prosecutor's argument was an answer to argument of opposing counsel. *See id.*[6]

## C. Harm

Even assuming the trial court erred in denying defense counsel's objection, such error would not be reversible. Improper argument will not constitute grounds for reversal unless it affected the defendant's substantial rights—that is, unless the statements to the jury "injected new and harmful facts to the case" or were "so extreme and manifestly improper that they deprived appellant of a fair and impartial trial." *Brown*, 270 S.W.3d at 573 n.3 (citing *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988)); *see* TEX.

---

[5] Silva contends that, even if statements in voir dire may be considered evidence, the prosecutor's remark did not accurately reflect the venire members' statements. We note, however, that at least two venire members described situations in which child sexual abuse victims delayed their outcries because they were "embarrassed."

[6] As noted above, Silva argues that the prosecutor's remark could not have been a proper "answer" to his counsel's argument regarding the delayed outcry because the defensive argument was made "only after the State initially framed and highlighted the topic." He does not cite any authority, and we find none, indicating that the State forfeits its right to respond to defense counsel's closing argument merely because the State was the first party to raise the particular subject matter involved.

R. APP. P. 44.2(b) (providing that non-constitutional error which "does not affect substantial rights must be disregarded" on appeal); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) ("A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict."). "The remarks must have been a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000).

To determine if a defendant's substantial rights were affected by an improper argument, we consider: "(1) [the] severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction)." *Threadgill v. State*, 146 S.W.3d 654, 666–67 (Tex. Crim. App. 2004) (citing *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)).

First, the severity of the misconduct was low. Silva claims the prosecutor "reached outside the evidentiary record to brandish emotionally charged stories of sexual abuse confided by the venire members during voir dire." He notes that

> [o]ne of the main reasons for restraining the prosecutor and demanding a high standard of care in closing argument is that, due to the position of a prosecutor as a public official, an allusion to extrinsic evidence and interjection of his own views may be given undue weight by the jurors.

*Fant-Caughman v. State*, 61 S.W.3d 25, 31 (Tex. App.—Amarillo 2001, pet. ref'd). However, as noted, the prosecutor only obliquely referenced the colloquy which occurred during voir dire; she did not mention or refer to any specific facts relayed by the venire members. In any event, as discussed above, the State's argument was supported by witness testimony and responded to defense counsel's argument. Accordingly, we cannot

13

conclude the State's remark constituted a "willful and calculated effort" to deprive Silva of a fair and impartial trial. *See Wesbrook*, 29 S.W.3d at 115. Consideration of this factor weighs strongly against reversal.

Second, because the trial court overruled defense counsel's objections, it did not issue a curative instruction, and there were no other measures adopted to cure the alleged misconduct. This factor weighs in favor of reversal. *See Coleman*, 577 S.W.3d at 640 ("When a trial court overrules an objection to an improper argument, it implicitly places its 'imprimatur' on the argument, thereby magnifying the harm.").

Third, we find it extremely likely that the jury would have reached the same verdicts—on both guilt and punishment—had the prosecutor not made the challenged remark. This case, like most of its type, turned on the credibility of the alleged victim. Carla's outcry of abuse, though delayed, was largely consistent throughout her initial report, her forensic interview, her sexual assault nurse examination, and her testimony at trial.[7] Jackson stated that Carla was able to recall peripheral details about the abuse, which would have been unlikely if she had been coached. Silva emphasizes that Carla had sexual content on her cell phone, that she was expelled from her school at around the time she made the initial outcry, and that police conceded to making "missteps" in the investigation. But he does not explain how, in light of that evidence, the State's closing argument substantially influenced the jury's decision. It is noteworthy that the jury assessed punishment toward the lower end of the applicable range. *See* TEX. PENAL CODE

---

[7] The only inconsistency in Carla's story was that she told Jackson that the abuse occurred when she was "[s]ix or seven," whereas she told the nurse and testified at trial that it happened when she was nine years old. In this regard, we note that child victims are generally not expected "to testify with the same clarity and ability as is expected of mature and capable adults." *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990).

ANN. § 12.33(a) (stating that a second-degree felony is punishable by imprisonment for "any term of not more than 20 years or less than 2 years"). Under these circumstances, consideration of this factor weighs against reversal.

Overall, we conclude that Silva's substantial rights were not affected and he was not deprived of a fair and impartial trial as a result of the trial court's ruling. His issue on appeal is overruled.

### III.    CONCLUSION

The trial court's judgment is affirmed.

YSMAEL D. FONSECA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
22nd day of May, 2025.