

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-14-00236-CR

PAUL ANTWANN HARLAN, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 4 of Dallas County
Dallas County, Texas
Trial Court No. F13-56882-K

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

This appeal can best be understood as a series of scenes.

Act I, Scene 1:  The Convenience Store.  Multiple surveillance video recordings showed a masked gunman entering a Dallas[1] convenience store, brandishing a chrome handgun, and holding two employees at gunpoint, as his taller accomplice entered the store with a red duffel bag, beat one employee, took that employee's wallet, and forced the employee to open the cash registers. The gunman is seen carrying a black backpack and wearing a dark blue hoodie, a camouflage hat, dark pants, black shoes, and latex gloves.  As the robbers stuffed cash from the registers into their bags, two uniformed security guards noticed the ongoing robbery and apprehended the taller accomplice—identified as Latiki Bosman.  The shorter gunman ran away and left the scene in a white Lexus vehicle.

Act I, Scene 2:  The Nearby Residence.  Shortly thereafter, a short distance from the store, near the end of a dead-end road, Juan Pina arrived at his mother's residence, parked his car in the driveway, and exited the vehicle.  Pina then noticed a dark-complected male wearing a hoodie, sweatpants, and an army hat and carrying a dark backpack, who approached Pina and offered to pay him for a ride from the area. The stranger was jumpy and short of breath.  When Pina refused, the man pointed a chrome handgun at Pina and demanded the keys to the car.  Yielding the keys, Pina ran inside, while the stranger tried to start the car, but was prevented by a built-in safety feature.  Pina's cousins then came out of the house and chased the gunman away.  In the process

[1]Originally appealed to the Fifth Court of Appeals in Dallas, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts.  *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013).  We follow the precedent of the Fifth Court of Appeals in deciding this case.  *See* TEX. R. APP. P. 41.3.

of fleeing, the gunman dropped various items just taken from the store. Behind the residence sat the white Lexus, which had been crashed into a fence.

Act I, Scene 3: The Bridge. As some police officers collected items dropped at the residence, other officers used a K-9 named Pico to track the gunman's scent to a bridge, where they found and collected a nine millimeter Smith & Wesson handgun, a camouflage hat, and a dark shirt. Officers were unable to find the gunman that evening.

Act II, Scene 1: The Follow-Up. Two key bits of information led authorities, ultimately, to conclude that Paul Antwann Harlan, five feet, six inches tall, was the gunman. Pina, who was six feet, two inches tall, said that, though he did not get a good look at the gunman, the gunman was as tall as Pina's chin. Officers also learned that the crashed Lexus at the residence belonged to Latiki, obtained a search warrant, searched the vehicle, and found in the vehicle's trunk Harlan's and Latiki's wallets and cell phones.

Act II, Scene 2: The Brother. Two days after the robbery, a report came from someone at Pina's mother's residence that a man was searching the yard of the residence for something dropped by the searcher's brother the night his brother's Lexus was crashed behind the residence. The searcher was later identified as Keonte Bosman, suggested by the record to be the brother of Latiki Bosman, the owner of the Lexus.

Act III: The Trial. Harlan was tried before a Dallas jury on the charge of aggravated robbery with a deadly weapon. At trial, over objection, the court allowed into evidence a detective's testimony that, when he found Harlan's and Latiki's wallets in the trunk of the Lexus, he "surmised that most likely [they] had placed their wallets in the trunk [before] committing the

3

robbery." The jury found Harlan guilty, and, pursuant to the jury's finding of "true" on the State's enhancement allegation, Harlan was sentenced to fifty years' incarceration and was ordered to pay a $10,000.00 fine and court costs. The judgment recited that Harlan's conviction was for "aggravated robbery with a deadly weapon 2nd."

Act IV: The Appeal. On appeal, Harlan argues that the evidence was insufficient to support the jury's finding that he committed the crime, that the trial court erred in admitting the detective's allegedly speculative testimony, and that the trial court's judgment incorrectly reflects both the name of the offense and the finding of "true" on the State's enhancement allegation.

We modify the judgment and affirm it as modified, because (1) sufficient evidence establishes Harlan as the perpetrator of the offense, (2) admitting Loeb's testimony was not reversible error, (3) we must modify the trial court's judgment to properly reflect the offense, and (4) the judgment's recitation of a finding of "true" to the enhancement allegation remains.

*(1)    Sufficient Evidence Establishes Harlan as a Perpetrator of the Offense*

Harlan argues that the evidence is legally insufficient to support the jury's finding of guilt. We disagree.

"In analyzing a claim of insufficient evidence, we view all the evidence and reasonable inferences from the evidence in the light most favorable to the verdict and determine whether a rational fact-finder could have found the essential elements of the offense beyond a reasonable doubt." *IslasMartinez v. State*, 452 S.W.3d 874, 877 (Tex. App.—Dallas 2014, pet. ref'd) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Wise v. State*, 364 S.W.3d 900, 902 (Tex. Crim. App. 2012)). "The factfinder resolves all conflicts in the evidence and is the exclusive judge of

4

the credibility of the witnesses and the weight to give their testimony." *Id.* (citing *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000)); *see Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

"A party commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of property, he knowingly or intentionally threatens or places another in fear of imminent bodily injury or death."[2] *Lockett v. State*, 874 S.W.2d 810, 814 (Tex. App.—Dallas 1994, pet. ref'd); TEX. PENAL CODE ANN. § 29.02(a)(2) (West 2011). "The use or exhibition of a deadly weapon during the commission of a robbery aggravates the offense." *Lockett*, 874 S.W.2d at 814 (citing TEX. PENAL CODE ANN. § 29.03(a)(2) (West 2011)). In this case, Harlan challenges only the element of identity.

"Identity may be shown by circumstantial evidence and the reasonable inferences therefrom." *Adams v. State*, 418 S.W.3d 803, 810 (Tex. App.—Texarkana 2013, pet. ref'd); *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009); *see Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd). Juries are permitted to make reasonable inferences from the evidence at trial, and circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt. *Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). We examine the evidence offered at Harlan's trial to determine whether the State proved the element of identity.

---

[2]The State alleged that Harlan "intentionally and knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, threaten[ed] and place[d] ANWARUL HOQUE in fear of imminent bodily injury and death, [by . . . us[ing] and exhibit[ing] a deadly weapon, to-wit: A FIREARM."

5

Two masked perpetrators robbed a convenience store on the evening of May 7, 2013. Video surveillance footage showed that the first perpetrator to walk through the door, characterized as the shorter of the two, held convenience store employees, Anwarul Hoque and Maria Ochoa, at gunpoint. He brandished a chrome handgun, concealed his face by using a black shirt as a bandana, carried a black backpack, and wore a dark blue hoodie displaying the word "Brooklyn" across the chest, a camouflage hat, dark pants, black shoes, and latex gloves. The gunman's accomplice carried a red duffel bag and wore a grey hoodie and black pants. The gunman threatened to kill Ochoa and ordered her to lie on the ground while his accomplice beat Hoque, took his wallet, and forced him to open the cash registers. The robbers moved quickly to collect money from the registers.

As the robbers were in the process of stuffing their bags with cash and other items, they were spotted by two off-duty security guards who were still in uniform. One of the guards armed himself and apprehended the unarmed accomplice, but the gunman ran away. Richard Dellatorre, an officer with the Dallas Police Department (DPD), soon arrived to find the captured perpetrator in handcuffs, identified him as Latiki, and transported him to the police department.

Meanwhile, using the same white Lexus he had driven to the convenience store, the gunman travelled a short distance down a dead-end road before crashing the car through a backyard fence. Unaware of the crash in his mother's backyard, Pina arrived at his mother's home and parked his car in the front driveway. As he exited his vehicle, Pina heard someone shaking the gate at the side of the house. The gunman then approached Pina and asked for a ride away from the area. Pina described the assailant as jumpy and said, "[T]he way he was talking, he could

6

barely catch his breath." When Pina refused, the gunman brandished the handgun and demanded the keys to the car. The keys did the gunman no good. When the gunman was chased out of Pina's car by Pina's cousins, he left behind several boxes of cigars, a cardboard box labelled "$500 Quarters," rolled quarters and other cash, and miscellaneous papers. The gunman had also dropped cigar boxes and cash around Pina's mother's yard. On arrival, DPD Detective Joshua Cordes noticed that the gunman had left a trail of money as he fled the scene. Cordes collected the items[3] as DPD Corporal Armando Dominguez, Jr., used a dog, Pico, to begin the hunt for the gunman. Pico picked up the gunman's scent and led Dominquez to a bridge where they located, and Cordes collected, an abandoned nine millimeter Smith & Wesson handgun, a camouflage hat, and a dark shirt. Pico and Dominguez continued the manhunt, but were unable to find the gunman.

Officers spoke to Hoque and Ochoa to get a better description of the gunman, but both claimed they were too scared and nervous to notice any details about him. Likewise, Pina said he could not get a good look at the gunman because it was dark outside. However, Pina, who is around six feet two inches tall, testified that the gunman came up to his chin and estimated that he was five feet, eight or nine inches tall.

Detective Jeoff Loeb learned that the crashed Lexus belonged to Latiki and obtained a warrant to search it. In the trunk of the car, Loeb found Harlan's and Latiki's wallets and cell phones. Harlan's wallet contained his social security card and birth certificate. Based on his find, Loeb concluded that Harlan was the gunman. He interrogated Latiki, who remained tight-lipped about the identity of his accomplice. Nevertheless, Loeb secured a warrant for Harlan's arrest.

---

[3]Cordes testified that he returned the items to the convenience store.

7

Two days after the robbery, DPD Officer Scott Jay testified that someone calling from Pina's mother's house claimed that a six-foot, 160-pound male driving a 2013 gold Saturn had been searching her yard for something because the Lexus crash had involved his brother. With this information in mind, Jay began searching Latiki's prior police reports to determine if any people associated with him matched the description provided by the caller. Jay learned that Latiki had previously been arrested with a man named Keonte Bosman, concluded that Keonte might be Latiki's brother due to the shared last name, and noticed that Keonte matched the physical description given by the caller. Jay passed the information on to Loeb.

In a photographic lineup, from which Harlan was excluded, Pina identified Keonte as the man who pointed a gun at him a few days earlier. Yet, Leob testified that Keonte, who knew Harlan, provided him with information proving that he was not Latiki's accomplice in the convenience store robbery. Loeb also noticed that Latiki was approximately five feet, nine inches tall, that the gunman from the surveillance video was shorter than Latiki, and that Keonte was six feet, one inch tall. Based on this information, Loeb believed that Keonte could not have been the gunman. Leob ruled Keonte out as a suspect and focused his efforts on Harlan, who was five feet, six inches tall.

Harlan was arrested five days after Loeb had obtained a warrant for his arrest. Loeb collected buccal samples from Keonte and Harlan and submitted them to the Southwest Institute of Forensic Sciences (SWIFS) for comparison with any DNA found on the gun, hat, and shirt that Pico had located on the night of the robbery. Kaylie Slaughter, a forensic biologist for SWIFS, collected a swab sample from the gun, the inside sweatband of the hat, the brim of the hat, the

8

inside cuff of the shirt sleeve, and the interior neckline of the shirt. Slaughter also took a cutting from both the shirt and the hat.

Angela Fitzwater, a forensic biologist for SWIFS, conducted the DNA analysis of all the submitted samples. Fitzwater originally tested only the swab from the gun, and the cuttings from the shirt and hat. According to Fitzwater, a DNA profile of a single male was obtained from the shirt cutting, and she referred to this profile as "unknown male" because neither Keonte nor Harlan's DNA matched the DNA profile of this contributor. The cutting from the hat contained a mixture of at least two people, but Fitzwater's testing excluded Keonte, Harlan, and the unknown male as contributors to the DNA found on that sample. As for the gun, Fitzwater testified that because the sample contained low levels of DNA, she was unable to determine how many people had contributed to the sample, but was able to exclude both Keonte and the unknown male as contributors. However, Fitzwater testified, "[T]here were genetic markers within that DNA profile that corresponded to genetic markers in the DNA profile of Paul Harlan, and therefore I included him as a possible contributor" to the DNA found on the weapon. Yet, the "conservative random match probability" for the gun was only "1-in-7," meaning that "one person out of a group of [7] people would have those same sets of genetic markers that [Fitzwater] detected."

Based on the initial DNA test results, Fitzwater was asked to test the swabs from the shirt and the hat. Testing of the shirt swabs, which contained a DNA mixture of two people, revealed the unknown male to be the major contributor. Keonte and Harlan were both excluded as contributors to the DNA found on the shirt. Both swabs of the hat also contained a mixture of two people, but Harlan was included as a contributor, and Keonte and the unknown male were excluded

9

as contributors to the DNA found on the hat.  With respect to the first swab of the hat, Harlan's conservative random match probability was 1 in 1,160; for the second hat swab, it was 1 in 648.

After hearing this evidence, the jury found, beyond a reasonable doubt, that Harlan was the gunman who robbed the convenience store.  Harlan argues that the evidence is legally insufficient to prove his identity as the gunman because (1) Hoque, Ochoa, and Pina did not identify him as the assailant at trial, (2) Pina identified Keonte in a photographic lineup as the person who attempted to carjack him, (3) DNA testing excluded Harlan as a contributor to the DNA on the shirt, (4) DNA testing on the gun and hat demonstrated that a large pool of people with the same genetic markers as Harlan could have worn the hat and used the gun, and (5) the wallet's presence in Latiki's car did not prove that Harlan placed the wallet in the car or that he was the gunman. Harlan also argues that Loeb's testimony that he was looking for a suspect shorter than Latiki is suspect because Harlan is eight inches shorter than Latiki.  Jay testified that a report generated on the night of the robbery listed the gunman as being six feet, two inches tall, and the video surveillance suggests that the gunman was close to the same height as Latiki.

Certainly, this case presented the jury with conflicting inferences.  When the record supports conflicting inferences, a reviewing court must "presume that the factfinder resolved the conflicts in favor of the prosecution" and defer to that determination.  *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).  "We do not disturb the fact finder's decision unless it is irrational or supported by only a 'mere modicum' of evidence."  *Lockett*, 874 S.W.2d at 813 (citing *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)).

This circumstantial-evidence case was built brick by brick. The jury was able to view the gunman from several angles from the convenience store's video surveillance recordings. In addition to determining whether Loeb's testimony about the gunman's height was correct, the jury was able to visualize the gunman's build and mannerisms, albeit through baggy clothing, and could compare the gunman's build to Harlan's. Even though Pina picked Keonte as his assailant, the jury heard the six foot, two inch tall Pina testify that the assailant came up to his chin. Since the jury heard that Keonte was related to and had previously been arrested with Latiki and that Keonte knew Harlan, it was reasonable for the jury to infer that Latiki also knew Harlan, given that Harlan's personal items were found in Latiki's car. Thus, the jury could have determined that it was not by chance that Harlan's wallet and cell phone were found with Latiki's wallet and cell phone in the trunk of Latiki's car. The jury also heard testimony from Fitzwater stating that Harlan could not be excluded as a contributor to the DNA left behind on the gun and hat. Therefore, viewing all the evidence in the light most favorable to the verdict, we conclude a rational trier of fact could have found beyond a reasonable doubt that Harlan was a perpetrator in the robbery.

We overrule this point of error.

*(2)* *Admitting Loeb's Testimony Was Not Reversible Error*

Harlan next argues that the trial court erred in overruling his objection to the following portion of Loeb's testimony:

> I did find a wallet that belonged to apparently, Paul Harlan. His wallet was in the trunk of the vehicle. There was a Social Security card and a birth certificate, I believe, that was in there that identified him as a potential suspect. There was another wallet in the same trunk that belonged to Latiki Bosman, so I had surmised that most likely the suspects had placed their wallets in the trunk of the vehicle before committing the robbery.

11

Harlan objected to the testimony on the ground that it was speculative. After the State responded that the testimony "goes with regard to his investigation of the case," the trial court overruled Harlan's objection. Harlan argues that the trial court erred in doing so because "Loeb's testimony that [Harlan] had placed his wallet in the trunk of Latiki's car before robbing [the convenience store] was purely speculative."

It must be noted that, without objection, Loeb later testified, "I focused on Paul Harlan being the suspect, based on the fact of where his ID was found in the suspect vehicle." "Erroneously admitting evidence 'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.'" *Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010) (quoting *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)). Error in the admission of evidence is rendered harmless when "substantially the same evidence" is admitted elsewhere without objection. *Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991), *superseded by statute on other grounds*, TEX. CODE CRIM. PROC. ANN. art. 38.37 (West Supp. 2014); *see also Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010). From his briefing, it appears that Harlan challenges only the idea that he placed his wallet in the trunk before robbing the convenience store.

We review the trial court's admission of evidence for an abuse of discretion. *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). If the ruling is within the zone of reasonable disagreement, no abuse of discretion is shown. *Id.* at 343–44. "An abuse of discretion will be found 'only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree.'" *Shaw v. State*, 122 S.W.3d 358, 363 (Tex. App.—

Texarkana 2003, no pet.) (quoting *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)).

"The ruling will be upheld if it is permissible under any theory applicable to the case." *Id.* (citing

*Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

TEX. R. EVID. 602.

By his testimony, Loeb stated that he merely "surmised" that the suspects placed their

wallets in the trunk of Latiki's car before committing the robbery. However, expert opinions are

excluded from Rule 602's requirement that a witness have personal knowledge of the matter he is

testifying about. Facts or data relied on by an expert in forming an opinion need not be admissible

for the opinion itself to be admitted if (1) the expert based his opinion "on facts or data in the case

that the expert has been made aware of, reviewed, or personally observed," and (2) "experts in the

particular field would reasonably rely on those kinds of facts or data in forming an opinion on the

subject." TEX. R. EVID. 703. When the State responded that the testimony referenced the

investigation, Harlan did not assert any additional challenge. Latiki placed his wallet and cell

phone in the trunk of his car before robbing the convenience store. Because the trial court could

have determined that Loeb's testimony was based on the facts of his investigation and his years of

experience as a police officer, it could have ruled that Loeb's opinion that Harlan placed his wallet

in the trunk before robbing the store was admissible under Rule 703. Thus, we find that Harlan

has failed to show that the trial court abused its discretion in overruling his objection to Leob's

testimony. *See Reece v. State*, 878 S.W.2d 230, 325 (Tex. App.—Houston [1st Dist.] 1994, no

13

pet.) (officer allowed to express his opinion that defendant was selling crack cocaine based on facts of case and years of experience in law enforcement over objection that "[u]nless [the officer] got into [the defendant's] mind, he cannot testify as to what his opinion is"); *Lowery v. State*,[4] No. 05-08-00899-CR, 2010 WL 610915, at *6 (Tex. App.—Dallas Feb. 23, 2010, pet. ref'd) (not designated for publication) (admitting officer's testimony regarding why person "might dump a body next to a U-Haul truck" over speculation objection).[5]

We overrule this point of error.

*(3)     We Must Modify the Trial Court's Judgment to Properly Reflect the Offense*

The judgment recites that Harlan was convicted of "aggravated robbery with a deadly weapon 2nd." Harlan argues that no evidence supports the statement that he was previously convicted of aggravated robbery with a deadly weapon, and the State agrees. Consequently, both Harlan and the State seek modification of the trial court's judgment. "We may modify the judgment when we have the necessary information to do so." *IslasMartinez*, 452 S.W.3d at 877 (citing *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Asberry v. State*, 813 S.W.2d 526, 531 (Tex. App.—Dallas 1991, pet. ref'd)). We sustain this point of error and modify the trial court's judgment by deleting the reference that this conviction was Harlan's second of its type.

---

[4]Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

[5]Moreover, "[p]olice officers may testify about how a defendant became a suspect in the investigation." *Lowery*, 2010 WL 610915, at *5 (citing cases holding such testimony not inadmissible hearsay because not offered for truth of matter asserted).

14

*(4)    The Judgment's Recitation of a Finding of "True" to the Enhancement Allegation Remains*

The State alleged that, on June 27, 2000, in the Criminal District Court No. 2 of Dallas County, Texas, in Cause Number F0048701, Harlan was finally convicted of possession of a controlled substance in an amount of one gram or more, but less than four grams. Harlan pled true to the State's enhancement allegation in the presence of the jury. At punishment, the State introduced Harlan's written judicial confession to commission of the offense alleged in the enhancement allegation and the judgment of conviction for that offense. This judgment demonstrated that the offense was a third degree felony and that Harlan was sentenced to five years' confinement. As the verdict was read, however, the trial court did not indicate whether the jury rendered a verdict of true to the State's enhancement allegation. Further, no finding on the enhancement allegation was referenced during the pronouncement of Harlan's sentence. Although the reporter's record reflects that the punishment charge was read to the jury, the court reporter did not record what was read, and no copy of the punishment charge has been included in the appellate record.

Harlan argues that we must modify the judgment to reflect a finding of "not true" to the enhancement allegation because the record contains no finding of "true" by the jury.[6] "The validity of an enhancement allegation need not be submitted to the jury when there is no dispute concerning its validity." *Vance v. State*, 970 S.W.2d 130, 133 (Tex. App.—Dallas 1998, no pet.); *see Harvey v. State*, 611 S.W.2d 108, 112 (Tex. Crim. App. 1981) (op. on reh'g). Where a defendant pleads

---

[6]Harlan also argues that, because a finding of "not true" on the enhancement would reduce the applicable punishment range, we should remand the case for a new trial on punishment. The State argues that Harlan's sentence was "within the applicable range of punishment for the unenhanced felony."

true to the State's enhancement allegation, the trial court accepts his plea, the State introduces the prior judgment without objection, and no evidence is presented raising the validity of the enhancement, nothing more is required. *Mitchell v. State*, No. 2-05-426-CR, 2006 WL 3438012, at *2 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op., not designated for publication); *Vance*, 970 S.W.2d at 133.

The judgment reflects a finding of "true." "Recitals contained in a judgment create a presumption of regularity and truthfulness, absent an affirmative showing to the contrary." *Simms v. State*, 848 S.W.2d 754, 756 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (citing *Breazeale v. State*, 683 S.W.2d 446, 450 (Tex. Crim. App. 1984)). Thus, even though the appellate record fails to indicate whether the jury found the enhancement paragraph to be true, we may presume that the trial court made the required finding. Accordingly, we overrule this point of error.

We affirm the trial court's judgment, as modified.


Josh R. Morriss, III
Chief Justice

Date Submitted:      July 8, 2015
Date Decided:        September 3, 2015

Do Not Publish

16