1272-15

CAUSE NO. PD-1272-15

IN THE COURT

OF

CRIMINAL APPEALS

ORIGINAL

PAUL ANTWANN HARLAN, #1969190
Petitioner,

VS.

THE STATE OF TEXAS,
Respondent.

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 11 2015

Abel Acosta, Clerk

On review from the Sixth District Court of Appeals

at Texarkana, Texas

In Case No. 06-14-00263-CR

MR. HARLAN'S ORIGINAL PETITION FOR DISCRETIONARY REVIEW

Paul Antwann Harlan #1969190
French M. Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601
(325) 548-9035

Petitioner, Pro Se

FILED IN
COURT OF CRIMINAL APPEALS

DEC 11 2015

Abel Acosta, Clerk

# LIST OF PARTIES:

**PETITIONER:**

Paul Antwann Harlan #1969190
French M. Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601
(325) 548-9035

**RESPONDENT:**

The State of Texas

**DEFENSE COUNSEL AT TRIAL:**

Brenda Vonjoe
Attorney At Law
4144 N. Central Expressway, #650
Dallas, Texas 75204

Nicole Hines-Glover
3838 Oak Lawn Ave., #1000
Dallas, Texas 75219

**STATE ATTORNEY AT TRIAL:**

Hilary Wright and Chris Johnson
Dallas County District Attorney's Office
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399

**APPELLANT'S ATTORNEY ON APPEAL:**

Julie Woods
Dallas County Public Defender's Office
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-2
Dallas, Texas 75207-4399

**STATE ATTORNEY ON APPEAL:**

Susan Hawk (or her designated rep.)
Dallas County District Attorney's Office
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399

# TABLE OF CONTENTS:

LIST OF PARTIES ................................................... i

INDEX OF AUTHORITIES ........................................ iii

STATEMENT OF THE CASE ...................................... iv

ISSUE PRESENTED ................................................ 1

STATEMENT OF FACTS .......................................... 1

SUMMARY OF ARGUMENT ...................................... 3

ARGUMENT ......................................................... 3

Point Of Error 1, Restated:
The evidence is legally insufficient to support Petitioner's conviction for aggravated robbery because the State failed to prove beyond a reasonable doubt that Petitioner was the person who committed the charged offense.

PRAYER .............................................................. 12

CERTIFICATE OF SERVICE ....................................... 13

CERTIFICATE OF COMPLIANCE .................................. 13

# INDEX OF AUTHORITIES:

## U.S. Supreme Court Cases:

- **Jackson v. Virginia**, 443 U.S. 307 (1979) .............................. 4

## State Cases:

- **Brooks v. State**, 323 S.W.3d 893 (Tex.Crim.App. 2010)(plurality op.) ..... 4
- **Clayton v. State**, 235 S.W.3d 772 (Tex.Crim.App. 2007) .................. 5
- **Hooper v. State**, 214 S.W.3d 9 (Tex.Crim.App. 2007) ..................... 5, 9
- **Merritt v. State**, 368 S.W.3d 516 (Tex.Crim.App. 2012) .................. 5
- **Miller v. State**, 667 S.W.2d 773 (Tex.Crim.App. 1984) ................... 5
- **Moreno v. State**, 755 S.W.2d 866 (Tex.Crim.App. 1988) .................. 5
- **Westbrook v. State**, 29 S.W.3d 103 (Tex.Crim.App. 2000) ................. 4
- **Winfrey v. State**, 393 S.W.3d 763 (Tex.Crim.App. 2013) ................. 4
- **Wise v. State**, 364 S.W.3d 900 (Tex.Crim.App. 2012) .................... 4

## STATEMENT OF THE CASE:

A grand jury indicted Petitioner for aggravated robbery with a deadly weapon. (CR:10). Petitioner pled not guilty to the charge and proceeded to jury trial. (RR3:8; RR4:13). The jury found Petitioner guilty of the charged offense. (CR:96; RR5:88). Petitioner pled true to one enhancement paragraph alleging a prior felony conviction. (CR:10; RR6:4). The jury assessed a sentence of 50 years imprisonment and a $10,000 fine. (RR6:14-15). The trial court overruled Petitioner's motion for new trial. (CR:86). Petitioner timely filed his notice of appeal. (CR:88). Petitioner timely filed his direct appeal on May 19, 2015. The conviction was affirmed by the Sixth District Court of Appeals in Texas and modified by the court to reflect a non finding of "true" to an enhancement paragraph. See attached (Appendix: Exhibit - A). Petitioner now argues his issue(s) on the merits.

[ THIS SPACE INTENTIONALLY LEFT BLANK ]

## ISSUE PRESENTED:

## POINT OF ERROR 1

**The evidence is legally insufficient to support Petitioner's conviction for aggravated robbery because the State failed to prove beyond a reasonable doubt that Petitioner was the person who committed the charged offense.**

## STATEMENT OF FACTS:

Around 7:45 p.m. on May 7, 2013, Anwarul Hoque and Maria Ochoa were working at Hilda's Grocery, a convenience store located at 1016 Murdock Road in Dallas, Texas. Two men walked into the store and quickly walked toward Ochoa, ordering her to get on the floor. (RR4:45). Hoque, who was replenishing the store's Dr. Pepper supply at the time, saw the two men walk into the store. (RR4:24). Hoque observed one of the men carrying a gun. (RR4:24). The man with the gun walked toward Hoque and grabbed him. (RR4:24). Hoque saw Ochoa on the ground. (RR4:24).

The two men, whose faces were mostly covered, told Hoque to open the register and give them the money. (RR4:25). The man wearing the gray hoodie, who was apprehended at the scene and later identified as Latiki Bosman, punched Hoque's face. (RR4:26, 28; State's Ex. 23). Hoque testified that he was hurt from the punch and scared. (RR4:36-37).

The evening of May 7, 2013, Juan Pina drove to his mother's house at 7821 Cup Circle in Dallas, Texas, where he lived. (RR4:65-66). As he exited his car and walked towards the front door, he heard the metal gate at the side of the house shake. (RR4:67-68). A man wearing a hoodie, sweatpants, and an army hat and carrying a dark backpack approached Pina and offered money for Pina to drive the man out of the area. (RR4:69, 71, 74). When Pina refused, the man offered more money, pulled a chrome handgun from the pocket of his hoodie, an pointed it at Pina's face. (RR4:69). The man said, "Give me your fucking keys." (RR4:70). Pina complied then walked in the house. (RR4:70). When the man was not able to successfully start the car, he grabbed his backpack, slung it over his shoulder, and then ran away from the location. (RR4:70-71).

That same day, a K-9 Unit went to the scene where the Lexus used in the aggravated robbery of Hilda's Grocery crashed through a fence and into a tree.(RR4: 86-87, 89, 111; State's Ex. 32). The K-9 ("Pico") eventually led officers to a pistol, hat, and shirt. (RR4:86-87, 113-114; State's Ex. 57, 58, 59, 60, 61, 62, 64).

-1-

Jeff Loeb, a Dallas police detective in the robbery unit, was on call the evening of May 7, 2013. (RR4:133, 135). After receiving notification of the robbery at Hilda's Grocery, he responded to the location and started working the case that night. (RR4:136). He interrogated Latiki that night, but Latiki did not give Loeb any information about the second suspect's identity. (RR4:136). Loeb conducted his follow-up investigation to determine the name of the second suspect. (RR4:136).

Two days later, Officer Scott Jay, a Dallas police officer, responded to a service call for the same area in which the Lexus had been wrecked on May 7, 2013. (RR4:122). A woman called 911 to report an individual in her yard looking for some items. (4:121). The 911 caller reported having seen the individual on more than one occasion. (RR4:121). She provided a physical description of the person in her yard as a black male, six feet tall and 160 pounds. (RR4:129). That physical description matched the description of the suspect who fled Hilda's Grocery in the May 7, 2013, police report. (RR4:124). Using prior police reports with Latiki's name and information he learned from speaking to witnesses, Jay determined that the individual in the 911 caller's yard was Keonte Bosman. (RR4:124-25, 126). Jay put Keonte's name in his May 9, 2013 report and sent it to the lead detective in this case. (RR4:125). Loeb, the lead detective, learned that Latiki and Keonte had previously been arrested, and he obatined a warrant for Keonte's arrest. (RR4:137).

Loeb also obtained a search warrant for the Lexus that the police had now impounded. (RR4:138). Inside the trunk of the car, Loeb found a wallet with Petitioner's social security card and birth certificate. (RR4:138, 144-47; State's Ex. 74, 77). He believed that this wallet identified Petitioner as the potential suspect in the robbery of Hilda's Grocery. (RR4:138). Loeb also found a wallet that he believe belonged to Latiki. (RR4:138, 145; State's Ex. 73, 75).

Loeb testified that, "based mostly on height," he was comfortable that he knew Petitioner was the suspect in this case. (RR4:140). Loeb testified that Keonte is six feet one inch tall. Petitioner is five feet six inches tall, and Latiki is five feet nine inches tall. (RR4:140, 169). Loeb explained, "So based on me knowing the height of Latiki Bosman, it was clear to me that the second suspect, the one that had the gun in the video, did appear to be shorter than the other suspect." (RR4:140-41).

Due to page limit regulations, Petitioner has included all other relevant facts to his point of error with the argument of the respective error.

## SUMMARY OF ARGUMENT:

**Issue 1:** The State failed to prove beyond a reasonable doubt the essential element of identity in this case. The weak evidence in this case does not lead to a reasonable circumstanital inference that Petitioner was the person who committed aggravated robbery with Latiki. Because the State failed to prove beyond a reasonable doubt that Petitioner was the person who committed the offense, this Court should reverse the conviction and enter a judgement of acquittal.

## ARGUMENT:

### POINT OF ERROR 1; RESTATED:

The evidence is legally insufficient to support Petitioner's conviction for aggravated robbery because the State failed to prove beyond a reasonable doubt that Petitioner was the person who committed the charged offense.

### Reason(s) To Grant Review:

The Texas Sixth District Court of Appeals has decided an important question of state and federal law in a way that conflicts with the applicable decisions of the Court of Criminal Appeals and the Supreme Court of the United States. This ambiguity affects all who come before the Sixth District Court of Appeals in Texas by causing cases that are similarly situated to be affirmed in opposition to higher Court rulings.

### Facts:

Neither Hoque nor Ochoa (the victims) could identify the two suspects in the robbery of Hilda's Grocery on May 7, 2013. Hoque explained that he did not pay attention to the suspects' clothes. (RR4:25). He did not see their faces because they wore "masks." (RR4:25). He could not recall whether they wore shorts or pants, long-sleeved or short-sleeved shirts. (RR4:25). He was too scared to pay attention to these details. (RR4:25). He did not make an in-court identification of the person with Latiki (Petitioner's co-defendant). (RR4:17-42).

Ochoa recalled that the suspects "had sweaters on with caps, and their faces were covered." (RR4:45). She did not make an in-court identification of the person with Latiki. (RR4:43-50).

Pina (a would-be victim) did not make an in-court identification of the person who attempted to carjack him the night of May 7, 2013. (RR4:11, 65-79). During a photo lineup administered by Officer Loeb, a few days after the offense date,

-3-

Pena chose Keonte as the person who attempted to take his car. (RR4:11, 79). Prior to trial, and at Petitioner's request, the court held a hearing outside the jury's presence. (RR4:5-12). During this hearing, Pina affirmatively stated that he could not tell whether the person who approached him the night of May 7, 2013, at his mother's house, was in the courtroom. (RR4:11).

When Loeb spoke with Latiki about the robbery, Latiki remained tight-lipped about his accomplice. (RR4:136). Loeb suspected that Latiki would not give information about his accomplice because the accomplice was one of Latiki's relatives. (RR4:164).

Although Loeb initially believed that Keonte Bosman was the second suspect with Latiki, he ruled out Keonte as a suspect. (RR4:138). Loeb concluded that Petitioner was the person who committed the robbery with Latiki. (RR4:136). He testified that he came to this conclusion based on his personal assessment of the height of the person with Latiki, the fact that Petitioner's wallet and cell phone were inside Latiki's Lexus, and the DNA testing results. (RR4:136, 138, 140, 141; RR5:50).

Despite the fact that the DNA testing showed the presence of an unknown male's DNA profile on the shirt, Loeb testified that he did not hesitate in his decision to focus on Petitioner as the suspect. (RR5:50). He explained that because he "was already looking at a male as [his] suspect...it just confirmed that it was a male suspect's DNA on a shirt." (RR5:50).

## Standard of Review:

"In analyzing a claim of insufficient evidence, we view all the evidence and reasonable inferences from the evidence in the light most favorable to the verdict and determine whether a rational fact-finder could have found the essential elements of the offense beyond a reasonable doubt." **Wise v. State**, 364 S.W.3d 900, 902 (Tex. Crim.App. 2012)(citing **Jackson v. Virginia**, 443 U.S. 307, 318-19 (1979)). "The fact finder resolves all conflicts in the evidence and is the exclusive judge of the credibility of the witness and the weight to give their testimony." **Id**. (citing **Westbrook v. State**, 29 S.W.3d 103, 111 (Tex.Crim.App. 2000)); see **Winfrey v. State**, 393 S.W.3d 763, 768 (Tex.Crim.App. 2013). The **Jackson** standard is the only standard a reviewing court should apply to determine if the State proved each and every element of the offense beyond a reasonable doubt. **Brooks v. State**, 323 S.W.3d 893, 895 (Tex.Crim.App. 2010)(plurality op.). The reviewing court must defer to the fact finder's credibility and weight determinations since

the trier of fact is the sole judge of the credibility of a witness' testimony. **Id**. at 899. Juries are permitted to make reasonable inferences from the evidence at trial, and circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt. **Hooper v. State**, 214 S.W.3d 9, 14-15 (Tex.Crim. App. 2007). The reviewing court "determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." **Id**. at 16-17. A court's review of the evidence includes all admitted evidence regardless of whether the admission of evidence was erroneous. **Clayton v. State**, 235 S.W.3d 772, 778 (Tex.Crim. App. 2007).

## Applicable Law:

It is incumbent upon the State to prove beyond a reasonable doubt that the defendant is the person who committed the charged offense. **Miller v. State**, 667 S.W.2d 773, 775 (Tex.Crim.App. 1984). The State must prove that the defendant was criminally connected to the offense. See **Merritt v. State**, 368 S.W.3d 516, 525 (Tex.Crim.App. 2012). Identity may be shown by direct evidence, circumstantial evidence, or reasonable inferences from this evidence. **Gardner v. State**, 306 S.W.3d 274, 285 (Tex.Crim.App. 2009). "We do not disturb the fact finder's decision unless it is irrational or supported by only a 'mere modicum' of evidence." **Moreno v. State**, 755 S.W.2d 866, 867 (Tex.Crim.App. 1988).

## Analysis:

The State failed to prove beyond a reasonable doubt that Petitioner was the person who sommitted the charged offense with Latiki. Loeb's personal visual assessment of the height of the second suspect, as depicted on the video surveillance, and the DNA results are not sufficient proof to establish that Petitioner committed the charged offense. Furthermore, the presence of Petitioner's wallet inside Latiki's car did not prove beyond a reasonable doubt that Petitioner was the person with Latiki inside Hilda's Grocery on May 7, 2013.

## The Wallet.

The only evidence potentially probative of Petitioner's involvement in the offense was that a wallet containing Petitioner's birth certificate and social security card was inside the trunk of the car driven prior to and after the robbery of Hilda's Grocery. Indeed, Loeb only considered Petitioner a suspect after he found Petitioner's wallet inside the Lexus. Yet this piece of evidence hardly

proves that Petitioner was the person who actually committed the offense with Latiki. There is no evidence that the wallet contained any picture identification matching Petitioner's physical description. There is no evidence that Petitioner placed the wallet in the car. Nor is there evidence of how long the wallet had been inside the car. Furthermore, as plainly visible on the video surveillance, there is no evidence that Latiki and his accomplice placed any items in the trunk of the car before entering Hilda's. Without any proof of when Petitioner placed his wallet inside Latiki's car, if Petitioner did in fact place it there himself, the mere presence of the wallet in the car does not reasonably lead to an inference that Petitioner committed aggravated robbery with Latiki.

No rational juror could reasonably infer that Petitioner committed the charged offense simply by virtue of his wallet being inside Latiki's car. Without any other evidence establishing when and how the wallet ended up in Latiki's car, it is pure speculation that Petitioner placed his wallet inside the car prior to committing robbery with Latiki.

Additionally, there is no evidence as to who drove the Lexus from Hilda's and crashed the car after the robbery. Indeed, according to Loeb's recollection, the 911 caller who reported the suspicious person in her yard two days after the robbery reported that the suspicious person said his brother had crashed the car. (RR4:156). There is no evidence in the record that Petitioner is Keonte's brother. Keonte knew Petitioner, but never indicated that they were related. This suspicious person matched Keonte's physical description. If teh suspicious person in the yard near the crash site was Keonte, as the evidence suggests, then someone other than Petitioner crashed the Lexus. Yet even if the jury believed that Petitioner drove the Lexus and crashed the car, despite the lack of evidence establishing such a conclusion, it would not be logical to infer that Petitioner left his wallet with his identification inside the abandoned car.

At most, the fact that a wallet containing documents with Petitioner's name was inside Latiki's car simply establishes that someone placed the wallet inside the trunk at some point prior to the execution of the search warrant. There was no evidence that Petitioner placed his wallet inside Latiki's car and no evidence that the fact that Petitioner's wallet was inside this car meant that Petitioner committed robbery with Latiki. Furthermore, the record is completely devoid of any evidence that Petitioner was at or near Hilda's Grocery on May 7, 2013.

**DNA Results:**

Loeb testified that he believed Petitioner was the suspect based on the DNA results. However, this testimony is not supported by the facts in the record. The results of the DNA testing were not complete until October 7, 2013, and August 4, 2014. (RR5:24, 34; State's Ex. 80, 81). Loeb obtained an arrest warrant for Petitioner on June 14, 2013. (CR:11-14). Dallas police officer Phillip Lawler collected the warrant for Petitioner's arrest on June 18, 2013, and gathered intelligence about Petitioner's location. (RR4:172-73). Based on the arraignment information in the record, Petitioner was arrested on June 18, 2013, nearly four months **before** the first round of DNA testing results were available. (CR:15).

In any event, Loeb's conclusion that the DNA analysis confirmed his determination that Petitioner was the second suspect with Latiki is not supported by Fitzwater's (DNA Analyist) testimony about the DNA profiles on the hat, shirt and gun. Fitzwater testified that the probability that Petitioner's DNA profile was on the hat was 1 in 1,160 and 1 in 648. This probability means that out of all the people in the City of Dallas, 1,084 and 1,941 people in the city, respective to each probability, would have the same DNA profile. (RR5:38-39). If this significantly high number of people in the City of Dallas has the same DNA profile that was on the hat, then this is quite a large pool of people who potentially wore that hat. This evidence hardly established proof beyond a reasonable doubt that Petitioner was the person who wore the hat.

Futhermore, the likelihood that it was the unknown male's DNA on the shirt was so high that a rational jury could reasonably infer that the unknown male had worn the shirt. Futzwater explained that out of a pool of people equal to 29,000 times the Earth's population of 7,000,000,000 people, only one person would have that same DNA profile. This strong evidence logically indicates that someone other than Petitioner wore this shirt.

Fitzwater and Slaughter testified that they were not able to determine when DNA is deposited on an item. (RR5:19, 43). Slaughter further explained that skin cells can last a long time on an item. (RR5:19). Consequently, the fact that the hat and shirt contained a DNA profile matching Petitioner's DNA profile does not establish when the DNA was deposited. This evidence does not prove that Petitioner wore these items on May 7, 2013, during the aggravated robbery of Hilda's Grocery.

Slaughter also explained that DNA can transfer from item to item. (RR5:18).

-7-

Because the police collected the hat and shirt and placed them in the same bag together, it is not illogical to consider the fact that DNA transferred between the items. It was only after the second round of testing on the hat that Petitioner was included as a possible contributor.

The DNA results do not comport with the State's theory that Petitioner wore the camouflage hat and used the shirt to cover his face during the robbery. Hoque and Ochoa testified that the second suspect's face was covered. The video surveillance shows that the second suspect's neck and face were covered by a shirt and that he wore a camouflage hat. Pico (K-9 Unit) tracked the scent from the Lexus to the shirt in the ditch. Because the DNA testing established pretty conclusively that the unknown male wore the shirt, it is reasonable to infer that the unknown male was the person who covered his face with the shirt during the robbery then drove and crashed the Lexus after the robbery. Even if the jury did not believe that the unknown male was the accomplice, the DNA evidence in this case does not establish sufficient proof that Petitioner was the person who covered his face with the shirt and wore the hat during the robbery.

The DNA analysis of the gun indicated a low level of DNA. Fitzwater testified that low levels of DNA mean there are not enough genetic markers to make it uniquely identified to match it to an individual. (RR5:28-29). When the level of DNA is low, the statistical probability that a particular person is a contributor is a lot less. (RR5:28-29). Although Fitzwater included Petitioner as a possible contributor to the gun's DNA profile, the low level of DNA on the gun renders the likelihood that Petitioner's DNA was actually on the gun significantly less.

**Height.**

The only other piece of evidence upon which Loeb relied to form his opinion that Petitioner was the perpetrator of the robbery was Loeb's assessment of the height of the person with Latiki. Loeb's own testimony, however, established the difficulty in visually determining a person's height without measuring. He explained that "height and weight is probably the most incorrectly stated" description of suspects. (RR5:55). Loeb's emphasis on height is hardly convincing evidence to convict Petitioner as the second suspect in the robbery.

Contrary to Loeb's testimony that he could tell that the second suspect was shorter than Latiki, the video surveillance does not clearly depict that the person with Latiki was shorter than Latiki. The camera angle from behind the cash

register and counter shows the two men crouching and hunched over to take items from underneath the counter. (State's Ex. 11 Part 002 - Camera #5; State's Ex. 11 Part 003 - Camera #7). The camera views of the suspects inside Hilda's Grocery started from a point higher than the suspects' heads and angled down in the direction of the floor. (State's Ex. 11 Part 002 - Camera #5; State's Ex. 11 Part 003 - Camera #7; State's Ex. 11 Part 005 - Camera #10; State's Ex. 11 Part 008 - Camera #14). Nothing in these videos relect any concrete evidence that the second suspect was shorter than Latiki. Consequently, Loeb's testimony that the second suspect is shorter than Latiki is not supported by the facts of the case. See **Hooper**, 214 S.W.3d at 15 ("[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions.").

The camera view of the suspects entering Hilda's through the front door is equally conclusive as to the second suspect's height. Loeb testified that he was able to determine that the second suspect was shorter than Latiki based on his comparison of each suspect relative to a particular point on the lottery stand, as depicted in the video recording. Yet, the video surveillance does not support Loeb's conclusion. As the suspects pass by the lottery stand, each head appears to pass by the same point on the lottery stand, indicating that they are at least similar in height, if not the same height.

Jay testified that he recalled that the description of the second suspect in the May 7, 2013, report of the aggravated robbery was a black male, six feet two inches tall, and 160 pounds. (RR4:130). Based on Loeb's testimony, Petitioner is five feet six inches tall. (RR4:140-41). Therefore, it is not a reasonable inference that Petitioner was the suspect based on the height in comparison to the height as noted in the police report; Petitioner is a significant eight inches shorter than the height of the suspect described in the May 7, 2013, police report.

Furthermore, to infer that Petitioner was the second suspect based primarly on height is not reasonable. If the evidence had shown, for example, that Petitioner is seven feet tall, a relatively uncommon height, and the video surveillance depicted a man obviously more than a foot taller than Latiki, then perhaps Loeb's height analysis would be more persuasive. However, this is not the case here. According to Loeb, Petitioner is five feet six inches tall and Latiki is approximately five feet nine inches tall. When considering the fact that both suspects wore head coverings that obviously added inches to their overall height, this variance in height is not probative of the identity of the person who commi-

-9-

tted the offense with Latiki.

## The Remaining Evidence.

None of the witnesses who came into contact with the second robbery suspect on May 7, 2013, made an in-court identification of Petitioner as the suspect. During a photographic line-up administered a few days after the offense, Pina chose Keonte as the person who tried to carjack him and, according to the State, the person who committed the robbery of Hilda's Grocery with Latiki. Consequently, no witness identified Petitioner as the person who committed the robbery or as the person who attempted to take Pina's car.

A majority of the remaining evidence points away from Petitioner. Latiki's refusal to confirm the name of his accomplice reasonably leads to the conclusion that Latiki committed the offense with one of his relatives, especially in light of the fact that Latiki had committed offenses with relatives in the past. (RR4: 155-56).

The only evidence indicating Petitioner even knew Latiki was Keonte's statement to the police that he knew Petitioner. There is no additional evidence in the record indicating whether Petitioner knew Latiki or they spent time with each other.

Although the gun had a serial number, the State did not present any evidence to show who owned the gun. (RR4:96-98). The lack of ownership information coupled with the low levels of DNA on the gun did not establish sufficient evidence linking Petitioner to the gun used during the robbery.

## Conclusion.

The Sixth District Court of Appeals in Texas makes the assertion that the Petitioner's circumstantial evidence case was built brick by brick. See attached (Appendix - Exhibit, pg. 11). If those bricks are speculation, conjecture, assumption, and guess work, then, thy're right. Let's recap the events to see the "irrational" jury verdict and "mere modicum" of evidence.

When it came to identifying the Petitioner, neither Hoque nor Ochoa, the store owners, identified the Petitioner as the gunman prior to or at trial. Pina, the person which the gunman tried to steal his car at gun point with no mask, identified Keonte Bosman in a photographic line up as the person who attempted to carjack him. The surveillance tape in the store, which was heavily relied on by

-10-

Officer Loeb and later the jury, originally put the gun man at around 6 feet 2 inches tall and 160 pounds. This is according to Officer Jay, who testified as to the description of the second suspect in the May 7, 2013 report based on the robbery. (RR4:130). Officer Loeb's own testimony established difficulty in visually determining a person's height, in a video surveillance tape, without measuring, and explained that "height and weight is probably the most incorrectly stated descriptions of the suspects." (RR5:55). The Petitioner is only five feet six inches tall.

Secondly, DNA testing excluded Petitioner as a contributor to the DNA on the shirt. The DNA testing on the hat and gun, worn and used in the commission of the crime, gave a ratio that the probability of the Petitioner's DNA match for the hat and gun was 1 in 648, for the hat, and 1 in 7, for the gun. If we use these ratios to determine probability or likelihood that the DNA belonged to Petitioner, that would mean that the DNA on the hat shows a .02 percent chance that the DNA on the hat belonged to the Petitioner and a 14 percent chance that the DNA on the gun belonged to the Petitioner. If we apply these percentages to the world's population, the number of potential possibilities become astronomical. But, let's just compare those percentages to a more feasible location, the Dallas County metroplex, which consists of about 3 million people. That would mean that the DNA contributors to the hat could belong to approximately seven thousand other potential candidates. The DNA contributors to the gun could belong to approximately over 300,000 potential contributors.

The incongruent statement by the Sixth District Court of Appeals that, "the State built their circumstantial evidence case brick by brick" is a black-eye to law. The truth is that the State had no physical nor enough circumstantial evidence to convict the Petitioner, all while putting forth mere speculation as evidence and motive before the jury, knowing full well that the identification and scientific evidence relied on at trial was insufficient to sustain a conviction.

The State failed to prove beyond a reasonable doubt that Petitioner committed the charged offense with Latiki. The only evidence on which Loeb relied to conclude that Petitioner committed the offense was Petitioner's height, wallet, and the DNA results. Loeb's determination that Petitioner committed the offense because he was shorter than Latiki is not supported by the facts in the record. The fact that Petitioner's wallet was inside Latiki's car did not establish that

Petitioner was with Latiki during the robbery; it merely placed Petitioner's wallet inside the car. Finally, the DNA evidence was not strong and did not conclusively prove that Petitioner wore the hat or shirt during the robbery.

Even when considering this evidence in the light most favorable to the jury's verdict, the evidence remains insufficient to prove beyond a reasonable doubt that Petitoiner was the person who committed aggravated robbery. Because the State failed to prove identity in this case, the Court should reverse Petitioner's conviction abd enter a judgment of acquital.

## PRAYER:

**WHEREFORE, PREMISES CONSIDERED**, Petitioner prays that this Court reverse the conviction and enter a judgment of acquittal. In the alternative, Petitioner prays that this Court reverse and remand for a new trial.

Petitioner prays for general relief and all other relief he may be entitled.

I, **Paul Antwann Harlan, TDCJ # 1969190**, being presently incarcerated at the French M. Robertson Unit of the Texas Department of Criminal Justice, in Jones County, Texas; do hereby verify and declare under penalty of perjury that the foregoing statements are both true and correct, as well s offered in good faith.

[Tex.Civ.Prac.& Rem.Code § 132.001-003 et deq./Title 28 U.S.C. § 1746]
(A signed/dated copy of this PEITTION shall have the same validity as its original)

**SIGNED AND EXECUTED on this the 2nd day of December, 2015.**

RESPECTFULLY SUBMITTED,

/s/ Paul Harlan # 1969190

Petitioner, Pro Se

Paul Antwann Harlan #1969190
French M. Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601
(325) 548-9035

-12-

## CERTIFICATE OF SERVICE:

The above signer hereby certifies that a true and correct copy of the foregoing MR. HARLAN'S PETITION FOR DISCRETIONARY REVIEW has been served on ALL parties in this matter, via 1st Class U.S. Mail, Postage Pre-Paid, deposited in the outgoing prison mailbox on this the **3rd day of December, 2015;** addressed to:

- Dallas County Criminal District Attorney's Office
  Appellate Division
  133 N. Riverfront Blvd., 10th Floor
  Dallas, Texas  75207

- Attorney for the State
  P.O. Box 12548
  Capitol Station
  Austin, Texas  78711

*Paul Antnam Harlan* #1969190

## CERTIFICATE OF COMPLIANCE:

The above signed also hereby certifies that the word count in this document is 10,000 words or less.

*Paul Antnam Harlan* #1969190



# Court of Appeals
## Sixth Appellate District of Texas

# J U D G M E N T

Paul Antwann Harlan, Appellant

No. 06-14-00236-CR        v.

The State of Texas, Appellee

Appeal from the Criminal District Court No. 4 of Dallas County, Texas (Tr. Ct. No. F13-56882-K). Opinion delivered by Chief Justice Morriss, Justice Moseley and Justice Burgess participating.

As stated in the Court's opinion of this date, we find there was partial error in the judgment of the court below. Therefore, we modify the trial court's judgment by deleting the reference that this conviction was Harlan's second of its type. The modified judgment shall reflect aggravated robbery with a deadly weapon as the offense of conviction. As modified, the judgment of the trial court is affirmed.

We note that the appellant, Paul Antwann Harlan, has adequately indicated his inability to pay costs of appeal. Therefore, we waive payment of costs.

RENDERED SEPTEMBER 3, 2015
BY ORDER OF THE COURT
JOSH R. MORRISS, III
CHIEF JUSTICE

ATTEST:
Debra K. Autrey, Clerk



# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00236-CR
_____


PAUL ANTWANN HARLAN, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the Criminal District Court No. 4 of Dallas County
Dallas County, Texas
Trial Court No. F13-56882-K


Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

This appeal can best be understood as a series of scenes.

Act I, Scene 1: The Convenience Store. Multiple surveillance video recordings showed a masked gunman entering a Dallas[1] convenience store, brandishing a chrome handgun, and holding two employees at gunpoint, as his taller accomplice entered the store with a red duffel bag, beat one employee, took that employee's wallet, and forced the employee to open the cash registers. The gunman is seen carrying a black backpack and wearing a dark blue hoodie, a camouflage hat, dark pants, black shoes, and latex gloves. As the robbers stuffed cash from the registers into their bags, two uniformed security guards noticed the ongoing robbery and apprehended the taller accomplice—identified as Latiki Bosman. The shorter gunman ran away and left the scene in a white Lexus vehicle.

Act I, Scene 2: The Nearby Residence. Shortly thereafter, a short distance from the store, near the end of a dead-end road, Juan Pina arrived at his mother's residence, parked his car in the driveway, and exited the vehicle. Pina then noticed a dark-complected male wearing a hoodie, sweatpants, and an army hat and carrying a dark backpack, who approached Pina and offered to pay him for a ride from the area. The stranger was jumpy and short of breath. When Pina refused, the man pointed a chrome handgun at Pina and demanded the keys to the car. Yielding the keys, Pina ran inside, while the stranger tried to start the car, but was prevented by a built-in safety feature. Pina's cousins then came out of the house and chased the gunman away. In the process

[1]Originally appealed to the Fifth Court of Appeals in Dallas, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedent of the Fifth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

2

of fleeing, the gunman dropped various items just taken from the store. Behind the residence sat the white Lexus, which had been crashed into a fence.

Act I, Scene 3: The Bridge. As some police officers collected items dropped at the residence, other officers used a K-9 named Pico to track the gunman's scent to a bridge, where they found and collected a nine millimeter Smith & Wesson handgun, a camouflage hat, and a dark shirt. Officers were unable to find the gunman that evening.

Act II, Scene 1: The Follow-Up. Two key bits of information led authorities, ultimately, to conclude that Paul Antwann Harlan, five feet, six inches tall, was the gunman. Pina, who was six feet, two inches tall, said that, though he did not get a good look at the gunman, the gunman was as tall as Pina's chin. Officers also learned that the crashed Lexus at the residence belonged to Latiki, obtained a search warrant, searched the vehicle, and found in the vehicle's trunk Harlan's and Latiki's wallets and cell phones.

Act II, Scene 2: The Brother. Two days after the robbery, a report came from someone at Pina's mother's residence that a man was searching the yard of the residence for something dropped by the searcher's brother the night his brother's Lexus was crashed behind the residence. The searcher was later identified as Keonte Bosman, suggested by the record to be the brother of Latiki Bosman, the owner of the Lexus.

Act III: The Trial. Harlan was tried before a Dallas jury on the charge of aggravated robbery with a deadly weapon. At trial, over objection, the court allowed into evidence a detective's testimony that, when he found Harlan's and Latiki's wallets in the trunk of the Lexus, he "surmised that most likely [they] had placed their wallets in the trunk [before] committing the

3

robbery." The jury found Harlan guilty, and, pursuant to the jury's finding of "true" on the State's enhancement allegation, Harlan was sentenced to fifty years' incarceration and was ordered to pay a $10,000.00 fine and court costs. The judgment recited that Harlan's conviction was for "aggravated robbery with a deadly weapon 2nd."

Act IV: The Appeal. On appeal, Harlan argues that the evidence was insufficient to support the jury's finding that he committed the crime, that the trial court erred in admitting the detective's allegedly speculative testimony, and that the trial court's judgment incorrectly reflects both the name of the offense and the finding of "true" on the State's enhancement allegation.

We modify the judgment and affirm it as modified, because (1) sufficient evidence establishes Harlan as the perpetrator of the offense, (2) admitting Loeb's testimony was not reversible error, (3) we must modify the trial court's judgment to properly reflect the offense, and (4) the judgment's recitation of a finding of "true" to the enhancement allegation remains.

*(1)    Sufficient Evidence Establishes Harlan as a Perpetrator of the Offense*

Harlan argues that the evidence is legally insufficient to support the jury's finding of guilt. We disagree. .

"In analyzing a claim of insufficient evidence, we view all the evidence and reasonable inferences from the evidence in the light most favorable to the verdict and determine whether a rational fact-finder could have found the essential elements of the offense beyond a reasonable doubt." *IslasMartinez v. State,* 452 S.W.3d 874, 877 (Tex. App.—Dallas 2014, pet. ref'd) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19 (1979); *Wise v. State,* 364 S.W.3d 900, 902 (Tex. Crim. App. 2012)). "The factfinder resolves all conflicts in the evidence and is the exclusive judge of

4

the credibility of the witnesses and the weight to give their testimony." *Id.* (citing *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000)); *see Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

"A party commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of property, he knowingly or intentionally threatens or places another in fear of imminent bodily injury or death."[2] *Lockett v. State*, 874 S.W.2d 810, 814 (Tex. App.—Dallas 1994, pet. ref'd); TEX. PENAL CODE ANN. § 29.02(a)(2) (West 2011). "The use or exhibition of a deadly weapon during the commission of a robbery aggravates the offense." *Lockett*, 874 S.W.2d at 814 (citing TEX. PENAL CODE ANN. § 29.03(a)(2) (West 2011)). In this case, Harlan challenges only the element of identity.

"Identity may be shown by circumstantial evidence and the reasonable inferences therefrom." *Adams v. State*, 418 S.W.3d 803, 810 (Tex. App.—Texarkana 2013, pet. ref'd); *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009); *see Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd). Juries are permitted to make reasonable inferences from the evidence at trial, and circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt. *Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). We examine the evidence offered at Harlan's trial to determine whether the State proved the element of identity.

---

[2] The State alleged that Harlan "intentionally and knowingly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, threaten[ed] and place[d] ANWARUL HOQUE in fear of imminent bodily injury and death, [by . . . us[ing] and exhibit[ing] a deadly weapon, to-wit: A FIREARM."

5

Two masked perpetrators robbed a convenience store on the evening of May 7, 2013. Video surveillance footage showed that the first perpetrator to walk through the door, characterized as the shorter of the two, held convenience store employees, Anwarul Hoque and Maria Ochoa, at gunpoint. He brandished a chrome handgun, concealed his face by using a black shirt as a bandana, carried a black backpack, and wore a dark blue hoodie displaying the word "Brooklyn" across the chest, a camouflage hat, dark pants, black shoes, and latex gloves. The gunman's accomplice carried a red duffel bag and wore a grey hoodie and black pants. The gunman threatened to kill Ochoa and ordered her to lie on the ground while his accomplice beat Hoque, took his wallet, and forced him to open the cash registers. The robbers moved quickly to collect money from the registers.

As the robbers were in the process of stuffing their bags with cash and other items, they were spotted by two off-duty security guards who were still in uniform. One of the guards armed himself and apprehended the unarmed accomplice, but the gunman ran away. Richard Dellatorre, an officer with the Dallas Police Department (DPD), soon arrived to find the captured perpetrator in handcuffs, identified him as Latiki, and transported him to the police department.

Meanwhile, using the same white Lexus he had driven to the convenience store, the gunman travelled a short distance down a dead-end road before crashing the car through a backyard fence. Unaware of the crash in his mother's backyard, Pina arrived at his mother's home and parked his car in the front driveway. As he exited his vehicle, Pina heard someone shaking the gate at the side of the house. The gunman then approached Pina and asked for a ride away from the area. Pina described the assailant as jumpy and said, "[T]he way he was talking, he could

6

barely catch his breath." When Pina refused, the gunman brandished the handgun and demanded the keys to the car. The keys did the gunman no good. When the gunman was chased out of Pina's car by Pina's cousins, he left behind several boxes of cigars, a cardboard box labelled "$500 Quarters," rolled quarters and other cash, and miscellaneous papers. The gunman had also dropped cigar boxes and cash around Pina's mother's yard. On arrival, DPD Detective Joshua Cordes noticed that the gunman had left a trail of money as he fled the scene. Cordes collected the items[3] as DPD Corporal Armando Dominguez, Jr., used a dog, Pico, to begin the hunt for the gunman. Pico picked up the gunman's scent and led Dominquez to a bridge where they located, and Cordes collected, an abandoned nine millimeter Smith & Wesson handgun, a camouflage hat, and a dark shirt. Pico and Dominguez continued the manhunt, but were unable to find the gunman.

Officers spoke to Hoque and Ochoa to get a better description of the gunman, but both claimed they were too scared and nervous to notice any details about him. Likewise, Pina said he could not get a good look at the gunman because it was dark outside. However, Pina, who is around six feet two inches tall, testified that the gunman came up to his chin and estimated that he was five feet, eight or nine inches tall.

Detective Jeoff Loeb learned that the crashed Lexus belonged to Latiki and obtained a warrant to search it. In the trunk of the car, Loeb found Harlan's and Latiki's wallets and cell phones. Harlan's wallet contained his social security card and birth certificate. Based on his find, Loeb concluded that Harlan was the gunman. He interrogated Latiki, who remained tight-lipped about the identity of his accomplice. Nevertheless, Loeb secured a warrant for Harlan's arrest.

---

[3]Cordes testified that he returned the items to the convenience store.

7

Two days after the robbery, DPD Officer Scott Jay testified that someone calling from Pina's mother's house claimed that a six-foot, 160-pound male driving a 2013 gold Saturn had been searching her yard for something because the Lexus crash had involved his brother. With this information in mind, Jay began searching Latiki's prior police reports to determine if any people associated with him matched the description provided by the caller. Jay learned that Latiki had previously been arrested with a man named Keonte Bosman, concluded that Keonte might be Latiki's brother due to the shared last name, and noticed that Keonte matched the physical description given by the caller. Jay passed the information on to Loeb.

In a photographic lineup, from which Harlan was excluded, Pina identified Keonte as the man who pointed a gun at him a few days earlier. Yet, Leob testified that Keonte, who knew Harlan, provided him with information proving that he was not Latiki's accomplice in the convenience store robbery. Loeb also noticed that Latiki was approximately five feet, nine inches tall, that the gunman from the surveillance video was shorter than Latiki, and that Keonte was six feet, one inch tall. Based on this information, Loeb believed that Keonte could not have been the gunman. Leob ruled Keonte out as a suspect and focused his efforts on Harlan, who was five feet, six inches tall.

Harlan was arrested five days after Loeb had obtained a warrant for his arrest. Loeb collected buccal samples from Keonte and Harlan and submitted them to the Southwest Institute of Forensic Sciences (SWIFS) for comparison with any DNA found on the gun, hat, and shirt that Pico had located on the night of the robbery. Kaylie Slaughter, a forensic biologist for SWIFS, collected a swab sample from the gun, the inside sweatband of the hat, the brim of the hat, the

inside cuff of the shirt sleeve, and the interior neckline of the shirt. Slaughter also took a cutting from both the shirt and the hat.

Angela Fitzwater, a forensic biologist for SWIFS, conducted the DNA analysis of all the submitted samples. Fitzwater originally tested only the swab from the gun, and the cuttings from the shirt and hat. According to Fitzwater, a DNA profile of a single male was obtained from the shirt cutting, and she referred to this profile as "unknown male" because neither Keonte nor Harlan's DNA matched the DNA profile of this contributor. The cutting from the hat contained a mixture of at least two people, but Fitzwater's testing excluded Keonte, Harlan, and the unknown male as contributors to the DNA found on that sample. As for the gun, Fitzwater testified that because the sample contained low levels of DNA, she was unable to determine how many people had contributed to the sample, but was able to exclude both Keonte and the unknown male as contributors. However, Fitzwater testified, "[T]here were genetic markers within that DNA profile that corresponded to genetic markers in the DNA profile of Paul Harlan, and therefore I included him as a possible contributor" to the DNA found on the weapon. Yet, the "conservative random match probability" for the gun was only "1-in-7," meaning that "one person out of a group of [7] people would have those same sets of genetic markers that [Fitzwater] detected."

Based on the initial DNA test results, Fitzwater was asked to test the swabs from the shirt and the hat. Testing of the shirt swabs, which contained a DNA mixture of two people, revealed the unknown male to be the major contributor. Keonte and Harlan were both excluded as contributors to the DNA found on the shirt. Both swabs of the hat also contained a mixture of two people, but Harlan was included as a contributor, and Keonte and the unknown male were excluded

9

as contributors to the DNA found on the hat. With respect to the first swab of the hat, Harlan's conservative random match probability was 1 in 1,160; for the second hat swab, it was 1 in 648.

After hearing this evidence, the jury found, beyond a reasonable doubt, that Harlan was the gunman who robbed the convenience store. Harlan argues that the evidence is legally insufficient to prove his identity as the gunman because (1) Hoque, Ochoa, and Pina did not identify him as the assailant at trial, (2) Pina identified Keonte in a photographic lineup as the person who attempted to carjack him, (3) DNA testing excluded Harlan as a contributor to the DNA on the shirt, (4) DNA testing on the gun and hat demonstrated that a large pool of people with the same genetic markers as Harlan could have worn the hat and used the gun, and (5) the wallet's presence in Latiki's car did not prove that Harlan placed the wallet in the car or that he was the gunman. Harlan also argues that Loeb's testimony that he was looking for a suspect shorter than Latiki is suspect because Harlan is eight inches shorter than Latiki. Jay testified that a report generated on the night of the robbery listed the gunman as being six feet, two inches tall, and the video surveillance suggests that the gunman was close to the same height as Latiki.

Certainly, this case presented the jury with conflicting inferences. When the record supports conflicting inferences, a reviewing court must "presume that the factfinder resolved the conflicts in favor of the prosecution" and defer to that determination. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). "We do not disturb the fact finder's decision unless it is irrational or supported by only a 'mere modicum' of evidence." *Lockett*, 874 S.W.2d at 813 (citing *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988)).

This circumstantial-evidence case was built brick by brick. The jury was able to view the gunman from several angles from the convenience store's video surveillance recordings. In addition to determining whether Loeb's testimony about the gunman's height was correct, the jury was able to visualize the gunman's build and mannerisms, albeit through baggy clothing, and could compare the gunman's build to Harlan's. Even though Pina picked Keonte as his assailant, the jury heard the six foot, two inch tall Pina testify that the assailant came up to his chin. Since the jury heard that Keonte was related to and had previously been arrested with Latiki and that Keonte knew Harlan, it was reasonable for the jury to infer that Latiki also knew Harlan, given that Harlan's personal items were found in Latiki's car. Thus, the jury could have determined that it was not by chance that Harlan's wallet and cell phone were found with Latiki's wallet and cell phone in the trunk of Latiki's car. The jury also heard testimony from Fitzwater stating that Harlan could not be excluded as a contributor to the DNA left behind on the gun and hat. Therefore, viewing all the evidence in the light most favorable to the verdict, we conclude a rational trier of fact could have found beyond a reasonable doubt that Harlan was a perpetrator in the robbery.

We overrule this point of error.

## (2)    *Admitting Loeb's Testimony Was Not Reversible Error*

Harlan next argues that the trial court erred in overruling his objection to the following portion of Loeb's testimony:

> I did find a wallet that belonged to apparently, Paul Harlan. His wallet was in the trunk of the vehicle. There was a Social Security card and a birth certificate, I believe, that was in there that identified him as a potential suspect. There was another wallet in the same trunk that belonged to Latiki Bosman, so I had surmised that most likely the suspects had placed their wallets in the trunk of the vehicle before committing the robbery.

11

Harlan objected to the testimony on the ground that it was speculative. After the State responded that the testimony "goes with regard to his investigation of the case," the trial court overruled Harlan's objection. Harlan argues that the trial court erred in doing so because "Loeb's testimony that [Harlan] had placed his wallet in the trunk of Latiki's car before robbing [the convenience store] was purely speculative."

It must be noted that, without objection, Loeb later testified, "I focused on Paul Harlan being the suspect, based on the fact of where his ID was found in the suspect vehicle." "Erroneously admitting evidence 'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.'" *Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010) (quoting *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)). Error in the admission of evidence is rendered harmless when "substantially the same evidence" is admitted elsewhere without objection. *Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991), *superseded by statute on other grounds*, TEX. CODE CRIM. PROC. ANN. art. 38.37 (West Supp. 2014); *see also Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010). From his briefing, it appears that Harlan challenges only the idea that he placed his wallet in the trunk before robbing the convenience store.

We review the trial court's admission of evidence for an abuse of discretion. *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). If the ruling is within the zone of reasonable disagreement, no abuse of discretion is shown. *Id.* at 343–44. "An abuse of discretion will be found 'only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree.'" *Shaw v. State*, 122 S.W.3d 358, 363 (Tex. App.—

12

Texarkana 2003, no pet.) (quoting *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992)). "The ruling will be upheld if it is permissible under any theory applicable to the case." *Id.* (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

TEX. R. EVID. 602.

By his testimony, Loeb stated that he merely "surmised" that the suspects placed their wallets in the trunk of Latiki's car before committing the robbery. However, expert opinions are excluded from Rule 602's requirement that a witness have personal knowledge of the matter he is testifying about. Facts or data relied on by an expert in forming an opinion need not be admissible for the opinion itself to be admitted if (1) the expert based his opinion "on facts or data in the case that the expert has been made aware of, reviewed, or personally observed," and (2) "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." TEX. R. EVID. 703. When the State responded that the testimony referenced the investigation, Harlan did not assert any additional challenge. Latiki placed his wallet and cell phone in the trunk of his car before robbing the convenience store. Because the trial court could have determined that Loeb's testimony was based on the facts of his investigation and his years of experience as a police officer, it could have ruled that Loeb's opinion that Harlan placed his wallet in the trunk before robbing the store was admissible under Rule 703. Thus, we find that Harlan has failed to show that the trial court abused its discretion in overruling his objection to Leob's testimony. *See Reece v. State*, 878 S.W.2d 230, 325 (Tex. App.—Houston [1st Dist.] 1994, no

13

pet.) (officer allowed to express his opinion that defendant was selling crack cocaine based on facts of case and years of experience in law enforcement over objection that "[u]nless [the officer] got into [the defendant's] mind, he cannot testify as to what his opinion is"); *Lowery v. State*,[4] No. 05-08-00899-CR, 2010 WL 610915, at *6 (Tex. App.—Dallas Feb. 23, 2010, pet. ref'd) (not designated for publication) (admitting officer's testimony regarding why person "might dump a body next to a U-Haul truck" over speculation objection).[5]

We overrule this point of error.

*(3)    We Must Modify the Trial Court's Judgment to Properly Reflect the Offense*

The judgment recites that Harlan was convicted of "aggravated robbery with a deadly weapon 2nd." Harlan argues that no evidence supports the statement that he was previously convicted of aggravated robbery with a deadly weapon, and the State agrees. Consequently, both Harlan and the State seek modification of the trial court's judgment. "We may modify the judgment when we have the necessary information to do so." *IslasMartinez*, 452 S.W.3d at 877 (citing *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Asberry v. State*, 813 S.W.2d 526, 531 (Tex. App.—Dallas 1991, pet. ref'd)). We sustain this point of error and modify the trial court's judgment by deleting the reference that this conviction was Harlan's second of its type.

---

[4]Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

[5]Moreover, "[p]olice officers may testify about how a defendant became a suspect in the investigation." *Lowery*, 2010 WL 610915, at *5 (citing cases holding such testimony not inadmissible hearsay because not offered for truth of matter asserted).

*(4)    The Judgment's Recitation of a Finding of "True" to the Enhancement Allegation Remains*

The State alleged that, on June 27, 2000, in the Criminal District Court No. 2 of Dallas County, Texas, in Cause Number F0048701, Harlan was finally convicted of possession of a controlled substance in an amount of one gram or more, but less than four grams. Harlan pled true to the State's enhancement allegation in the presence of the jury. At punishment, the State introduced Harlan's written judicial confession to commission of the offense alleged in the enhancement allegation and the judgment of conviction for that offense. This judgment demonstrated that the offense was a third degree felony and that Harlan was sentenced to five years' confinement. As the verdict was read, however, the trial court did not indicate whether the jury rendered a verdict of true to the State's enhancement allegation. Further, no finding on the enhancement allegation was referenced during the pronouncement of Harlan's sentence. Although the reporter's record reflects that the punishment charge was read to the jury, the court reporter did not record what was read, and no copy of the punishment charge has been included in the appellate record.

Harlan argues that we must modify the judgment to reflect a finding of "not true" to the enhancement allegation because the record contains no finding of "true" by the jury.[6] "The validity of an enhancement allegation need not be submitted to the jury when there is no dispute concerning its validity." *Vance v. State*, 970 S.W.2d 130, 133 (Tex. App.—Dallas 1998, no pet.); *see Harvey v. State*, 611 S.W.2d 108, 112 (Tex. Crim. App. 1981) (op. on reh'g). Where a defendant pleads

---

[6]Harlan also argues that, because a finding of "not true" on the enhancement would reduce the applicable punishment range, we should remand the case for a new trial on punishment. The State argues that Harlan's sentence was "within the applicable range of punishment for the unenhanced felony."

15

true to the State's enhancement allegation, the trial court accepts his plea, the State introduces the prior judgment without objection, and no evidence is presented raising the validity of the enhancement, nothing more is required. *Mitchell v. State*, No. 2-05-426-CR, 2006 WL 3438012, at *2 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op., not designated for publication); *Vance*, 970 S.W.2d at 133.

The judgment reflects a finding of "true." "Recitals contained in a judgment create a presumption of regularity and truthfulness, absent an affirmative showing to the contrary." *Simms v. State*, 848 S.W.2d 754, 756 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd) (citing *Breazeale v. State*, 683 S.W.2d 446, 450 (Tex. Crim. App. 1984)). Thus, even though the appellate record fails to indicate whether the jury found the enhancement paragraph to be true, we may presume that the trial court made the required finding. Accordingly, we overrule this point of error.

We affirm the trial court's judgment, as modified.


Josh R. Morriss, III
Chief Justice

Date Submitted:     July 8, 2015
Date Decided:       September 3, 2015

Do Not Publish

16

Paul Harlan #1969190
Robertson Unit 4E-38T
12071 FM 3522
Abilene, Tx. 79601

Legal Mail

Court of Criminal APPEALS
Abel Acosta (Clerk)
P.O.BOX 12308, Capitol Station
Austin, Tx. 78711

